# EXHIBIT 1

JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
Andrew J. Thomas (Bar No. 159533)
David R. Singer (Bar No. 204699)
Amy M. Gallegos (Bar No. 211379)
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
rstone@jenner.com
ajthomas@jenner.com
dsinger@jenner.com
agallegos@jenner.com
(213) 239-5100

Attorneys for Plaintiffs
Fox Broadcasting Company, Twentieth Century
Fox Film Corp., and Fox Television Holdings, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX BROADCASTING COMPANY, TWENTIETH CENTURY FOX FILM CORPORATION, and FOX TELEVISION HOLDINGS, INC. | Case No.  2:12-CV-04529-DMG-SH |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT AND BREACH OF CONTRACT** |
| v. | |
| DISH NETWORK L.L.C., DISH NETWORK CORPORATION. and ECHOSTAR TECHNOLOGIES L.L.C. | **DEMAND FOR JURY TRIAL** [PUBLICLY REDACTED] |
| Defendants. | |

Plaintiffs Fox Broadcasting Company, Twentieth Century Fox Film Corporation, and Fox Television Holdings, Inc. (collectively, "FOX") allege the following against Dish Network L.L.C. and Dish Network Corporation (DISH") and EchoStar Technologies LLC ("EchoStar") (collectively, "the DISH Parties"):

## NATURE OF THE ACTION

1. FOX, as well as the other three major broadcast television networks – ABC, CBS and NBC – licenses DISH to retransmit primetime network programming as it is aired through owned-and-operated and affiliated local television stations across the country. FOX also has agreed to license primetime broadcast programming to DISH for video-on-demand service to consumers under certain conditions, including prohibiting fast forwarding through commercials. Commercial advertising is vital to broadcast television, as the robust choices and quality of primetime programming, including such hit shows as FOX's *Glee, The Simpsons, Bones,* and *Touch,* are possible only because they are supported by the advertising revenues generated from television commercials.

2. Recently, the DISH Parties – in violation of the copyright laws and DISH's license agreement with FOX – launched their own bootleg broadcast video-on-demand service called PrimeTime Anytime that is available to top-tier DISH subscribers who lease the Hopper set-top box from DISH. Once enabled, PrimeTime Anytime makes an unauthorized copy of the entire primetime broadcast schedule for all four major networks every night unless the subscriber chooses to block particular networks or particular nights from being recorded. The DISH Parties advertise this unauthorized library, which is available for up to eight days and includes approximately 100 hours of programming, as providing "on demand access" to that programming. To make matters worse, the DISH Parties operate their bootleg PrimeTime Anytime service so that the copies they make are viewable commercial free.

3. This lawsuit is not about DISH enhancing consumer choice. By stealing FOX's broadcast programming to create a bootleg video-on-demand service for all network primetime programming, the DISH Parties are undermining legitimate consumer choice by undercutting authorized on-demand services and by offering a service that, if not enjoined, will ultimately destroy the advertising-

- 2 -

2472554.2

1   supported ecosystem that provides consumers with the choice to enjoy free over-
2   the-air, varied, high-quality primetime broadcast programming.  Nor is this case
3   about traditional DVRs used by consumers to time-shift individual television
4   programs that they select and record, which FOX is not challenging in this action
5   and which are completely different from the DISH Parties' unauthorized Primetime
6   Anytime service.

7      4.    FOX and its affiliated companies invest hundreds of millions of dollars
8   each year to create and deliver quality primetime television programs.  These
9   programs are available over the air free of charge to anyone in the United States.
10  FOX, like all major broadcast networks, is able to offer such copyrighted
11  programming to the public for free over the airwaves because the production,
12  exhibition, and licensing of the programs is supported by commercial advertising.
13  Quite simply, advertisements provide the lion's share of funding for the
14  copyrighted programs that the public enjoys at no direct charge.

15     5.    There is a legitimate and varied market for licensed services that
16  provide video-on-demand and programs for instant viewing over the Internet or on
17  mobile devices.  FOX's primetime programming is available on demand over the
18  Internet on its website (fox.com), and on Hulu (Hulu.com), and FOX also licenses
19  its programming to Amazon and iTunes, among others, which provide consumers
20  with on-demand access to the programming.  FOX's primetime programming is
21  available to Hulu Plus subscribers in a reduced-commercial format, and available
22  commercial-free to consumers who purchase it through Amazon and iTunes.  This
23  puts the lie to DISH's claim that its unauthorized and unlicensed video-on-demand
24  service is somehow necessary to enhance "consumer choice."  FOX also makes
25  video-on-demand content available to cable and satellite providers such as DISH,
26  but rather than use and comply with its license from FOX for video-on-demand
27  content, the DISH Parties chose to steal copyrighted programming to make their
28  own version to interfere with legitimate markets and services.

6.    The DISH Parties' unlawful conduct does not stop there.  DISH's retransmission license expressly prohibits DISH from distributing Fox Programming over the Internet.  Yet, the DISH Parties' Sling Adapter redistributes and streams FOX's programming over the Internet.  And in January 2013 – while this litigation was pending – the DISH Parties announced DISH Anywhere, which allows subscribers to view programming over the Internet and on mobile devices such as cell phones and tablets.  The centerpiece of DISH Anywhere is the second generation Hopper set-top box, which streams FOX's programming over the Internet to PCs and mobile devices such as tablets and smartphones.  Streaming Fox programming over the Internet without authorization violates copyright law, breaches DISH's agreements with FOX, and allows the DISH Parties to compete unfairly with licensed providers such as iTunes and Amazon.  The DISH Parties have also announced a new service called "Hopper Transfers," which allows subscribers to copy programs from their DVRs to an iPad, and which also breaches DISH's agreements with FOX.

7.    In sum, the DISH Parties, like every other cable and satellite television distributor, received narrow permission to retransmit the signals that include FOX's primetime broadcast.  Unlike every other distributor, however, the DISH Parties willfully took advantage of their position to make and distribute unauthorized copies of FOX's primetime programming and render them commercial-free on playback, so that they could advertise to the world that: "DISH CREATED COMMERCIAL-FREE TV."  The DISH Parties also willfully took advantage of their position to retransmit FOX's programming over the Internet to PCs and mobile devices without authorization.  The DISH Parties have no right to copy and distribute FOX's programs through an unauthorized video-on-demand service.  Nor do the DISH Parties have the right to distribute FOX's programs over the Internet, or to mobile devices.  It is up to FOX – the owner of these valuable

- 4 -

1 rights – to make them available to licensees and consumers under terms and
2 conditions set by FOX, not the DISH Parties.

3

4 **THE PARTIES**

5     8. Plaintiff Fox Broadcasting Company ("FBC") is a Delaware
6 corporation with its principal place of business at 10201 West Pico Blvd., Los
7 Angeles, California. FBC operates the FOX Network, a national broadcast
8 television network with 203 affiliates reaching approximately 99% of all United
9 States households.

10     9. Plaintiff Twentieth Century Fox Film Corp. ("Twentieth Century
11 Fox") is a Delaware corporation with its principal place of business at 10201 West
12 Pico Blvd., Los Angeles, California. Twentieth Century Fox owns copyrights in
13 certain original primetime television programs broadcast on the FOX Network and
14 distributed via other media in the United States and around the world.

15     10. Plaintiff Fox Television Holdings, Inc. ("Fox TV Holdings") is a
16 Delaware corporation with its principal place of business at 10201 West Pico Blvd.,
17 Los Angeles, California. Fox TV Holdings is the parent company of the owned-
18 and-operated local broadcast stations that carry the prime time programming
19 licensed by the FOX Network.

20     11. On information and belief, Defendant Dish Network L.L.C. (Dish
21 Network) is a Colorado limited liability company with its principal place of
22 business at 9601 South Meridian Blvd., Englewood, Colorado. Dish Network is a
23 multichannel video provider, offering television, movies and sports programming
24 through a Direct Broadcast Satellite system to subscribers who pay fees to Dish
25 Network to receive its service. Dish Network receives and retransmits the signals
26 of local FOX stations to its subscribers pursuant to a Retransmission Consent
27 Agreement entered in 2002 with Fox TV Holdings (the "Retransmission Consent
28 Agreement"), most recently amended in 2010.

2172554.2

12.   On information and belief, Defendant Dish Network Corporation ("Dish Corp.") is a Nevada Corporation with its principal place of business at 9601 South Meridian Blvd., Englewood Colorado.   On information and belief, Dish Network is wholly owned by Dish Corp.

13.   On information and belief, Defendant EchoStar Technologies LLC is a Texas Corporation, and its principal place of business is 100 Inverness Terrace, East, Englewood, Colorado.

14.   On information and belief, Dish and EchoStar are under common ownership, management and control, and EchoStar Technologies is dependent on Dish for a substantial portion of its business and revenues.

15.   On information and belief, each of the defendants was the agent, joint venturer and/or employee of each of the remaining defendants, and in doing the things hereinafter alleged, each was acting within the course and scope of said agency, employment and joint venture with the advance knowledge, acquiescence, and subsequent ratification of each and every remaining defendant.

## JURISDICTION AND VENUE

16.   This civil action seeks injunctive relief, compensatory damages, and statutory damages for copyright infringement under the Copyright Act, 17 U.S.C. 101, *et seq.*, and for breach of contract.

17.   This Court has exclusive subject matter jurisdiction over the Copyright Act claims pursuant to 28 U.S.C. Sections 1331 and 1338(a), and has pendent jurisdiction over the state law claims under 28 U.S.C. Section 1367.

18.   This Court has personal jurisdiction over DISH and EchoStar because they do continuous, systematic, and routine business in California.

19.   Venue is proper in this Court under 28 U.S.C. Sections 1391(b) and 1400 because a substantial part of the acts of infringement complained of herein

21172554.2

1   occurred and will continue to occur in this district, and because the Court has
2   personal jurisdiction over the parties.

3

4   **GENERAL ALLEGATIONS**

5   **A.   FOX's Copyrighted Primetime Programming**

6       20.   FOX is the legal or beneficial owner of the copyrights in numerous
7   primetime programs that have been, or will be, exhibited on the FOX Network (the
8   "FOX Programs").   The FOX Programs include popular and critically-acclaimed
9   television series such as *Glee*, *The Simpsons*, *Family Guy*, *Touch*, and *Bones*.   A
10  non-exhaustive list identifying representative samples of the FOX Programs is
11  attached hereto as Exhibit A.

12      21.   Each FOX Program is a copyrighted work pursuant to Section 102 of
13  the Copyright Act, 17 U.S.C. § 102.   The relevant copyrights have been registered
14  with the United States Copyright Office or will be the subject of an application for
15  registration filed with the Copyright Office.

16      22.   FOX broadcasts the FOX Programs over the air across the United
17  States.   The cost of producing, exhibiting, and licensing the FOX Programs is paid
18  for primarily by revenues from the advertisers whose commercials are shown
19  during the programs.

20  **B.   Commercial Advertising and the Broadcast Television Business Model**

21      23.   Broadcast television, sometimes called "free television" is transmitted
22  over the airwaves by local television stations.   The business model for broadcast
23  television is predicated on the sale of commercial advertisements that appear during
24  periodic breaks in a particular program.   Advertisers purchase commercial time or
25  "spots" to promote their own products or services.

26      24.   Television advertisers pay more money to have their advertisements
27  featured on television programs with higher viewership.   Advertisers also rely on
28  industry research and data that measure the number of viewers who actually view

- 7 -

1    the commercials during a particular program (sometimes called the number of
2    "impressions").   "Prime time" is the block of the television programming schedule
3    that attracts the most viewers, and advertisers therefore are willing to pay the
4    highest prices to have their commercials shown during this time.   Television
5    networks and local broadcast stations generally derive significant percentages of
6    their advertising revenues from selling the right to advertise before, during, or
7    immediately after the primetime programming airs.   Advertisers will not pay, or
8    will pay less, to have their advertisements placed with and around FOX's television
9    programming if the advertisements will be invisible to viewers.

10           25.     Broadcast television networks such as FOX also earn revenues from
11   retransmission consent agreements with various cable systems, satellite television
12   services, and other multichannel video programming distributors, all of whom pay a
13   fee for the right to retransmit broadcast television signals to their own subscribers.
14   However, the cost of producing high quality primetime programming such as the
15   Fox Programs is financed largely by advertising revenues.   If there were no
16   advertising revenues, the free broadcast television business model in the United
17   States would collapse.

18   **C.      Secondary Markets for the Distribution and Sale of the FOX Programs**

19           26.     FOX's business model – which is based on industry custom and
20   practice – further monetizes FOX's content by, among other things, distributing
21   that content via different media and platforms after the programs are first aired on
22   primetime television.   For example, a separate and growing market exists for
23   services that permit cable and satellite television subscribers to select from a library
24   of previously-aired television programs for immediate viewing on television.   These
25   services are commonly known as video-on-demand or "VOD."   VOD programs are
26   distributed after a short window following a program's original air date and time.
27   However, the ability to fast-forward through commercials on VOD is often
28   restricted.

- 8 -

2172554.2

27.     FOX also distributes the FOX Programs (including premium versions with reduced commercials) through various websites owned in whole or in part by FOX for home viewing, remote viewing, or viewing on mobile devices.

28.     FOX also distributes ultra-premium versions of the FOX Programs with no commercials via electronic rental and/or sell-through ("ESL") merchants such as iTunes, Amazon, Netflix, and Vudu for home viewing, remote viewing, or viewing on mobile devices.

29.     FOX recoups part of its substantial investment in creative programming by distributing its primetime programming, at a premium, in commercial-free formats, such as through on-demand television access, on-demand Internet access, and the sale of DVDs and Blu-Ray Discs.

30.     Therefore, separate markets and channels of distribution exist for consumers who wish to watch the FOX Programs in a reduced-commercial format, a commercial-free format, or a format that can be viewed on mobile devices or computers outside the home.  For example, consumers who pay for a Hulu Plus subscription are able to view the FOX Programs on mobile devices with reduced commercials.  Consumers may also pay to stream or download the FOX Programs from iTunes or Netflix and watch their favorite programs without commercials on a mobile device.

**D.     The DISH Parties' Unlawful Conduct**

    **1.     PTAT With AutoHop**

31.     On information and belief, one of DISH's primary strategies for differentiating itself from its competitors has been to focus on providing on-demand entertainment so as to position itself as an alternative to Netflix.  For example, in 2011, DISH bought the assets of Blockbuster and launched Blockbuster@Home (originally called Blockbuster Movie Pass).  On a web page titled "Blockbuster@Home -- The Netflix Alternative" DISH boasts that its service provides subscribers with the ability to "stream thousands of movies to your TV,

- 9 -

2172554.2

1    iPad®, or computer" and  "not only gives customers an alternative to Netflix, it

2    gives you one better."[1]  DISH also offers subscribers "thousands of On Demand TV

3    shows and movies" on their computers through the licensed service DISH Online.[2]

4         32.    In March 2012, DISH introduced the Hopper Whole-Home HD DVR

5    System (the "Hopper").  The Hopper is a set-top box made by EchoStar and leased

6    by DISH to subscribers who purchase DISH's top-tier television packages.  The

7    Hopper is essentially two recording systems in one box.  It contains a two-terabyte

8    hard drive which, as originally configured, was divided into partitions, with only

9    one terabyte available to the subscriber.  The other terabyte was reserved for and

10   controlled by the DISH Parties so that they could operate PTAT and AutoHop, and

11   other services.  The bootleg Primetime Anytime copies made by the DISH Parties

12   were stored on the DISH-controlled section of the hard drive.  The user-controlled

13   section housed a traditional, user-operated DVR that the subscriber could use to

14   select specific programs to record for later home viewing.

15        33.    When the Hopper was introduced, DISH boasted in a press release that

16   Primetime Anytime "creates an on-demand library of approximately 100 hours of

17   primetime TV shows."[3]  DISH's website currently touts Primetime Anytime as

18   providing "On Demand access for 8 days to all HD programming that airs during

19   primetime hours on ABC, CBS, FOX, and NBC without needing to schedule

20   individual recordings."[4]

21        34.    DISH has promoted Primetime Anytime as a substitute for legitimate

22   on-demand services.  During an interview while demonstrating Primetime Anytime,

23

24   [1]  http://dishtv.com/blog/2012/05/07/blockbusterhome-the-netflix-alternative/.

25   [2]  http://www.dish.com/entertainment/movies/#movies-dish-online.
     [3]  http://press.dishnetwork.com/press-releases/hopper-whole-home-hd-dvr-system-

26   now-avail/

27   [4]  http://www.dish.com/technology/receivers-dvrs/; *see also*
     http://www.dish.com/technology/hopper/ (touting the Hopper as providing "instant

28   on-demand access to your favorite primetime shows for 8 days.").

- 10 -

2172554.2

1  DISH's Vice President Vivek Khemka stated, "I don't think you'd need Hulu or
2  Hulu Plus after this."

3      35.    As originally configured, the DISH Parties created Primetime
4  Anytime's "on demand library of approximately 100 hours primetime of TV
5  shows" by recording, without authorization, all programming aired by the four
6  national broadcast networks during primetime hours every night.  Subscribers who
7  enabled PrimeTime Anytime did not have the ability to prevent the Dish Parties
8  from recording particular networks, nights, or programs.

9      36.    After this lawsuit and others were filed, in an attempt to improve its
10 litigation position, the Dish Parties made minor alterations to PTAT.  Specifically,
11 the Dish Parties updated the PTAT software so that its hard drive was no longer
12 partitioned, and so that subscribers could deselect networks and days of the week
13 from the PTAT recording, and could choose between 2 and 8 days of scheduled
14 storage time for the PTAT recordings.  These minor alterations did not transform
15 the PTAT service into a subscriber-operated DVR.

16     37.    On information and belief, the programming recorded by the DISH
17 Parties through the Primetime Anytime service consists exclusively of copyrighted
18 network programming, including the FOX Programs.

19     38.    FOX has not consented to the recording of its copyrighted programs by
20 the DISH Parties, or to the distribution by the DISH Parties to DISH subscribers of
21 copies of all of FOX's primetime programming for subsequent on-demand,
22 commercial-free viewing.

23     39.    The DISH Parties make the programming they record through
24 Primetime Anytime available for on-demand viewing without commercials through
25 use of its AutoHop Feature.  Auto Hop, which is exclusive to Primetime Anytime,
26 delivers to viewers the Primetime Anytime recordings without commercials and
27 without the need to fast forward.

28

2172554.2

40.     The express, advertised purpose of Auto Hop is to permit subscribers using Primetime Anytime to watch their on-demand copies of network primetime programming commercial free.  Auto Hop's launch was accompanied by a media blitz in which DISH announced that it was now offering "Commercial-free TV." Advertisements for DISH now boast that "DISH created commercial-free TV."

41.     DISH's website announces: "WATCH COMMERCIAL FREE TV . . . Now you can automatically skip commercials in primetime TV – on ABC, CBS, FOX and NBC in HD."[5]   And DISH's Auto Hop Quick Start Guide instructs subscribers:

> Here's where Auto Hop comes into play.  When you are ready to watch your recorded PrimeTime Anytime content, simply open the PrimeTime Anytime or DVR menu screen.  You will see a small Hopper (red kangaroo) icon beside each show that you may watch commercial free.
>
> When you select a show with the Hopper icon, a pop-up message will appear on screen that asks whether you want to enable Auto Hop.  Choose 'yes,' and simply sit back and watch the show commercial free.  Choose 'no,' and watch with the commercials intact.

42.     The Quick Start Guide goes on to explain that Auto Hop is "not like fast-forwarding": "Once you have chosen Auto Hop for your show, you can put the remote control down; you've enabled Auto Hop's patented technology to skip the commercials during your show automatically."

---

[5] http://www.dish.com/redirects/promotion/offer2/?WT.srch=1&KBID =62283&WT.mc_id=GSBNAUTHOP_3194&gclid=CITpuP3GkrACFQ5rhwodOk Msp

- 12 -

2172554.2

43.    Auto Hop operates only on the primetime network programming recorded through Primetime Anytime, and not on non-primetime programming, cable programming, or programming recorded by the subscriber with the Hopper's DVR.

44.    The Primetime Anytime service operates as follows.    Primetime Anytime is able to record all four networks simultaneously on a single tuner because the DISH Parties transmit the four networks' signals from a single satellite transponder.   Once a subscriber activates the service, the DISH Parties record all of the programming aired each night by the four broadcast networks during primetime hours (8 to 11 pm Monday through Saturday, and 7 to 11 pm Sunday), unless the subscriber deselects certain networks or days of the week.   Each night of recorded programming is saved for eight days on the Hopper's hard drive.   If the subscriber elects to save the recordings for fewer than 8 days, the link to the programs disappears from PTAT's user interface when the scheduled storage time expires, but the program remains stored on the hard drive for the full 8 days.   During the 2-8 days that the subscriber can access the PTAT recordings, she can select individual PTAT recordings to watch or save to the Hopper's DVR, which the DISH Parties refer to as the subscriber's "personal DVR."

45.    The copying done by the DISH Parties through Primetime Anytime is fundamentally different from the copying done by consumers who record programs using traditional DVRs.   A key difference is that DVRs are controlled by the consumer, not the cable or satellite provider.  A DVR user can record any program on any channel he or she receives, and can start and stop the recording instantaneously, at any time during the recording process, using a remote control. None of this is true of Primetime Anytime.   For example, the DISH subscriber cannot command Primetime Anytime to record specific channels.    Primetime Anytime can only record the four broadcast networks and never any other channels. The subscriber can block the recording of any of the four broadcast networks, but

- 13 -

1    she cannot add other channels. The subscriber cannot command the Primetime
2    Anytime system to record specific programs or specific times to record. The DISH
3    Parties select the programs to be included in the Primetime Anytime recording and
4    the time periods that will be recorded. The DISH subscriber cannot command
5    Primetime Anytime to instantly start or stop recording; Primetime Anytime cannot
6    be activated or deactivated during primetime.

7        46.    By offering Primetime Anytime, the DISH Parties are not merely
8    providing subscribers with a passive file storage device. The DISH Parties actively
9    control and are involved in the operation of all aspects of the Primetime Anytime
10   system. Unlike a traditional DVR, the Primetime Anytime service was specifically
11   and deliberately architected by the DISH Parties so as to record, and/or encourage
12   and facilitate the unauthorized recording of, hundreds of hours of copyrighted
13   television programs and distribute those copies in a revised format so they can be
14   viewed commercial-free by the subscriber. While Primetime Anytime is activated,
15   the DISH Parties record the network primetime programming on the Hopper hard
16   drive.

17       47.    The Hopper also includes a standard DVR (the "personal DVR"),
18   which is separate and apart from Primetime Anytime. The subscriber can use this
19   DVR to select, record, save, and play back programming. The use of this "personal
20   DVR" to record and play back individual programs selected by the user for later
21   viewing in the home is not at issue in this lawsuit.

22       **2.    The DISH Anywhere Service**
23       48.    At the time this lawsuit was filed, the DISH Parties were distributing
24   copyrighted programming over the Internet to subscribers' computers and mobile
25   devices through their Sling Adapter. The Sling Adapter is a device sold separately
26   which, when connected to a DISH set-top box such as the Hopper, streams live
27   television programming and DVR recordings over the Internet, where they can be
28   remotely viewed on DISH's website from any computer with Internet access or

- 14 -

2172554.2

from any mobile device running DISH's Remote Access application. On information and belief, PTAT recordings can be viewed over the Internet using Sling Adapter.

49. On January 7, 2013, DISH announced DISH Anywhere. DISH Anywhere allows Dish subscribers to view video content – including live television broadcasts – over the Internet. The centerpiece of DISH Anywhere is the second-generation Hopper set-top box which, according to DISH, allows subscribers to "[w]atch live and recorded television anywhere on Internet-connected tablets, smartphones, and PCs at no additional charge using the Hopper's new built-in Sling capabilities and the new DISH Anywhere app."[6]

50. According to DISH, the second-generation Hopper streams programming over the Internet by "encoding and redirecting" a live or recorded signal from the Hopper to Internet-connected iOS and Android tablets and smartphones."[7] It includes a new processor that, according to DISH, "runs nearly three times faster than any other satellite – TV receiver in the U.S. Market." [8]

51. DISH also announced that the second generation Hopper will come with a feature called "Hopper Transfers" which will copy recorded programs from the subscriber's set-top box to an iPad using a home Wi-Fi connection, so that they can be viewed outside the home on the iPad even when there is no Internet connection available.[9] On information and belief, Hopper Transfers is only available to DISH subscribers.

---

[6] http://about.dish.com/press-release/products-and-services/dishs-new-hopper-sling-delivers-unparalleled-choice-and-control-, last visited Jan. 15, 2013.
[7] Id.
[8] Id.
[9] http://dish.client.shareholder.com/releasedetail.cfm?ReleaseID=731960.

- 15 -

2172554.2

52.   By making Fox's programming available over the Internet and on mobile devices via Sling and Hopper Transfers, and by incorporating Sling into its heavily-marketed Hopper set-top box, the DISH Parties are usurping rights it never negotiated for and does not possess, in order to compete unfairly with authorized providers such as Hulu, iTunes and Amazon, who pay for the right to offer streaming and downloadable VOD versions of FOX programming to their customers.

### 3.   The AutoHop Copies

53.   On information and belief, EchoStar provides digital broadcast operations, including satellite uplinking/downlinking, transmission services signal processing, conditional access management and other services to DISH to facilitate DISH's delivery of television programming to consumers.

54.   On information and belief, the services EchoStar provides to DISH include development, testing, and delivery to consumers of the Hopper, the software to implement PTAT and the software to implement AutoHop. EchoStar has performed and continues to perform on a daily basis all tasks necessary to implement PTAT and AutoHop, including managing signals and encryption keys to enable PTAT and AutoHop, marking which primetime shows are to be included in PTAT recordings, and preparing and transmitting information to Hopper set top boxes that enables AutoHop to function.

55.   On information and belief, DISH requested and contracted with EchoStar for the development testing, and delivery of the software to implement PTAT and AutoHop and to perform the tasks necessary for the operation of PTAT and AutoHop.

56.   On information and belief, during development and testing of the PTAT and AutoHop services, EchoStar and DISH made and/or caused to be made each night for many months hundreds of unauthorized copies of the Fox Programs

- 16 -

1 and the primetime programs of other networks whose programming is copied by

2 PTAT. On information and belief, most of the devices used to make such

3 unauthorized copies were owned and in the possession of the DISH Parties at the

4 time the unauthorized recordings were made.

5   57. On information and belief, beginning no later than May 10, 2012,

6 EchoStar, at the request of and pursuant to its contracts with DISH, each and every

7 night has made unauthorized copies of portions of Fox programs in order to

8 maintain the ongoing operational quality of the AutoHop service.

9

10 **E.** **DISH's Breaches of the Retransmission Consent Agreement And Letter Agreement**

11   58. DISH does not have the right to copy and distribute FOX

12 programming in the ways described above. Under the Retransmission Consent

13 Agreement, DISH does not have the right to copy Fox programs, authorize its

14 subscribers to copy Fox programs (other than by consumers for private home use )

15 or use FOX's signal to create a VOD service where Fox programming can be

16 viewed commercial free.

17   59. In 2010, the Retransmission Consent Agreement between FOX and

18 DISH was amended by a Letter Agreement. The Letter Agreement states that FOX

19 will make available to DISH on a VOD basis all primetime series for which FOX

20 provides VOD content to any multichannel video programming distributor.

21 Although FOX has offered VOD content to DISH, DISH has never availed itself of

22 its VOD rights under the Retransmission Consent Agreement.

23   60. In the event that FOX provides VOD content to DISH pursuant to the

24 Letter Agreement, the Letter Agreement expressly protects FOX against the

25 distribution of VOD content without commercials. Specifically, if DISH offers

26 FOX VOD content to its subscribers, the Letter Agreement requires DISH to

27 disable fast-forward functionality during all advertisements, and expressly provides

28

1    that such fast-forward disabling is a necessary condition to the distribution of the

2    FOX content via VOD.

3        61.    DISH does not have the right to distribute FOX programming over the

4    Internet via the Sling Adapter or the second-generation Hopper.   The Letter

5    Agreement expressly states that DISH shall not retransmit or otherwise distribute

6    FOX's signal by means of the Internet, broadband or any other online technology or

7    wireless or cellular technology (such as cell phones, tablets, or PDAs).

8        62.    Dish does not have the right to offer a service that copies FOX

9    programming onto iPads.   The Retransmission Consent Agreement bars Dish from

10   copying or authorizing the copying of Fox programs, and as noted above, the Letter

11   Agreement bars Dish from distributing Fox programming over the Internet or on

12   wireless or cellular technology including, specifically, tablets.

13       63.    The Letter Agreement expressly prohibits DISH from frustrating or

14   circumventing, or attempting to frustrate or circumvent, the protections granted to

15   FOX under the Letter Agreement, which include the protections against

16   commercial-free VOD and unauthorized copying described above.

17   **FIRST CLAIM FOR RELIEF**

18   **(Direct Copyright Infringement against all Defendants)**

19       64.    FOX hereby realleges and incorporates by reference each and every

20   allegation of Paragraphs 1-63, above.

21       65.    Without the permission or consent of FOX, the DISH Parties have

22   reproduced, distributed, and publicly performed, and unless enjoined will continue

23   to reproduce distribute, and publicly perform, FOX's copyrighted works, including

24   but not limited to the FOX Programs listed in Exhibit A.

25       66.    Specifically, the DISH Parties have made, and unless enjoined will

26   continue to make, copies of such works by recording them through the operation of

27   its Primetime Anytime service.

28

- 18 -

2172554 2

1       67.   On information and belief, the DISH Parties have made, and unless

2    enjoined will continue to make, copies of such works by reproducing them as part

3    of the process by which it renders them commercial-free through Auto Hop.

4       68.   The DISH Parties cause and carry out the unauthorized copying of

5    FOX's  works by reproducing those works onto subscribers' Hopper set-top boxes

6    as part of the Primetime Anytime service, and by reproducing those works in

7    connection with the process by which it renders them commercial-free through

8    Auto Hop.

9       69.   The DISH Parties have made, and unless enjoined will continue to

10   make, copies of such works though the operation of the Sling Adapter.

11      70.   The DISH Parties have made, and unless enjoined will continue to

12   make, copies of such works through the operation of Hopper Transfers.

13      71.   Without permission or consent of FOX, the DISH Parties have

14   distributed, and unless enjoined will continue to distribute, FOX's copyrighted

15   works  by  providing DISH subscribers with an unauthorized video-on-demand

16   service for primetime television including the FOX Programs, by distributing

17   copies of the FOX Programs through the Primetime Anytime system that they

18   designed and operate, in a format that allows for commercial-free viewing, and by

19   distributing copies of the FOX Programs via Hopper Transfers.

20      72.   The DISH Parties have publicly performed, and unless enjoined will

21   continue to publicly perform, FOX's copyrighted works by streaming them over the

22   Internet to DISH subscribers via the Sling Adapter and the second-generation

23   Hopper.

24      73.   The DISH Parties' reproduction, distribution, and public performance

25   of the FOX Programs as described above constitutes infringement of FOX's

26   exclusive rights under copyright law in violation of 17 U.S.C. §§ 106(1), 106(3),

27   106(4) and 501.

28

1    74.    By means the foregoing conduct, the DISH Parties have exceeded the

2    scope of DISH's license from FOX to transmit the FOX Programs to the public.

3    This constitutes copyright infringement and violates FOX's exclusive rights under

4    17 U.S.C. §§ 106(1), 106(3), 106(4) and 501.

5    75.    The DISH Parties are directly liable for these acts of infringement

6    under the Copyright Act.

7    76.    The infringement of FOX's rights in each of its copyrighted works

8    constitutes a separate and distinct act of infringement.

9    77.    The DISH Parties' acts of infringement are willful, intentional, and

10   purposeful, in disregard of and with indifference to FOX's rights .

11   78.    As a result of the DISH Parties' willful copyright infringement, FOX

12   has been and will continue to be irreparably harmed.

13   79.    Unless restrained by the Court, the DISH Parties will continue to

14   engage in such willful copyright infringement.

15

16   **SECOND CLAIM FOR RELIEF**

17   **(Secondary Copyright Infringement against all Defendants)**

18   80.    FOX hereby realleges and incorporates by reference each and every

19   allegation of Paragraphs 1-79, above.

20   81.    As an alternative theory to its direct infringement claim, in the event

21   that the DISH Parties contend that the unlawful copying described herein is done by

22   DISH subscribers, FOX further alleges the following:

23   82.    The unauthorized copying of the FOX Programs is a violation of

24   FOX's exclusive rights under 17 U.S.C. § 106.  Among other things, and without

25   limitation, this conduct amounts to the unauthorized reproduction of FOX's

26   copyrighted works.

27

28

- 20 -

2172554.2

83. The unauthorized copying of the FOX Programs that the DISH Parties enable, encourage, and facilitate as described above is without FOX's consent and not otherwise permissible under the Copyright Act.

84. The DISH Parties are liable under the Copyright Act for the infringing acts of DISH subscribers as a contributory copyright infringer. The DISH Parties, through their own conduct, have induced, caused, encouraged, assisted and/or materially contributed to this infringing activity. The DISH Parties have actual and constructive knowledge of the direct infringement of FOX's copyrights by DISH subscribers. Indeed, the DISH Parties actively promote the infringements as a reason to purchase their products and services, provide tools that are indispensable to these infringements, in particular the Hopper set-top box, Primetime Anytime service, and Hopper Transfers app, and continuously facilitate the infringements including by, among other things, encouraging subscribers to use PrimeTime Anytime to copy FOX's copyrighted works and storing the unauthorized copies on the Hopper's hard drive, and encouraging subscribers to use Hopper Transfers to copy FOX Programs to their iPads.

85. The DISH Parties are vicariously liable under the Copyright Act for the infringing acts of DISH subscribers. The DISH Parties have the right and ability to supervise and/or control the infringing conduct of users of Primetime Anytime. *First*, the DISH Parties have made a deliberate decision to offer subscribers features that are specifically designed to enable widespread infringements, when they could have prevented or greatly limited that conduct by declining to offer or to facilitate or support use of those unlawful features. *Second*, the DISH Parties specifically designed Primetime Anytime and Hopper Transfers (and provided ongoing assistance to their customers) to encourage the reproduction of copyrighted works. *Third*, the DISH Parties' regular involvement is an indispensable link in its customers' infringing conduct.

- 21 -

86.   The DISH Parties have a direct financial interest in the infringement of FOX's copyrights by DISH subscribers.  The DISH Parties' economic success is directly tied to the popularity of the infringing conduct that they seek to encourage. Indeed, the infringing capabilities of Primetime Anytime – specifically that it creates unauthorized copies of primetime network programming for commercial-free viewing – and of Hopper Transfers are the Hopper's principal selling points.

87.   The DISH Parties are liable under the Copyright Act for inducing the infringing acts of DISH subscribers.  The DISH Parties took active steps to encourage its subscribers to use Primetime Anytime to infringe FOX's copyrights. The DISH Parties distributed the Hopper with the Primetime Anytime service with the intent that its subscribers use Primetime Anytime to infringe FOX's copyrights, as evidenced by their numerous advertisements and user manuals which encourage subscribers to activate Primetime Anytime in order to continuously record all primetime network programming and watch it on demand without commercials. Likewise, the DISH Parties took active steps to encourage its subscribers to use Hopper Transfers to copy FOX programs to iPads.

88.   The DISH Parties' acts have been willful, intentional and purposeful, in disregard of and with indifference to FOX's rights.

89.   As a result of the DISH Parties' conduct, FOX has been and will continue to be irreparably harmed.

90.   Unless restrained by the Court, the DISH Parties will continue to engage in such willful copyright infringement.

### THIRD CLAIM FOR RELIEF

### (Breach of Contract against DISH)

91.   FOX hereby realleges and incorporates by reference each and every allegation of Paragraphs 1-90, above.

21725542

92.   FOX has fully performed all obligations required of it under the Retransmission Consent Agreement, as amended by the Letter Agreement, except to the extent prevented or excused by DISH's breaches or other wrongful conduct.

93.   DISH has materially breached the Retransmission Consent Agreement, as amended by the Letter Agreement, by copying Fox programs and providing to its subscribers commercial-free FOX Programs on demand, via the Primetime Anytime system and Auto Hop feature. Because the Letter Agreement provides protections against the distribution of commercial-free FOX Programs on demand, DISH has breached its express contractual obligation not to take any actions intended to frustrate or circumvent, or attempt to frustrate or circumvent, the protections granted to FOX under the Letter Agreement.

94.   DISH has also materially breached the Retransmission Consent Agreement, as amended by the Letter Agreement, by distributing the signals of FOX stations over the Internet via its Sling Adapter and the second-generation Hopper's "Sling" functionality. DISH's actions relating to the Sling Adapter product and service and Hopper's Sling functionality violate the Letter Agreement, which prohibits distribution via the Internet.

95.   DISH has also materially breached the Retransmission Consent Agreement by copying, and/or authorizing its subscribers to copy, Fox Programs to iPads using Hopper Transfers.

96.   FOX has been damaged as a direct and proximate result of the breaches set forth above.

### FOURTH CLAIM FOR RELIEF

#### (Breach of the Implied Covenant of Good Faith against DISH)

97.   FOX hereby realleges and incorporates by reference each and every allegation of Paragraphs 1-96, above.

- 23 -

2172554.2

1      98.   By providing to its subscribers commercial-free FOX Programs on

2  demand, via the Primetime Anytime service and Auto Hop feature, by distributing

3  the signals of FOX stations over the Internet via its Sling Adapter product and

4  service and via the second-generation Hopper's "Sling" functionality, DISH has

5  deprived FOX of the right to receive benefits under the Retransmission Consent

6  Agreement, as amended by the Letter Agreement.

7      99.   DISH's conduct constitutes a breach of the implied covenant of good

8  faith and fair dealing implicit in every contractual relationship.

9      100.  FOX has been damaged as a direct and proximate result of DISH's

10  breach of the implied covenant of good faith and fair dealing.

11

12                          **PRAYER FOR RELIEF**

13      WHEREFORE, FOX prays for judgment as follows:

14      1.   For an order preliminarily and permanently enjoining and restraining

15  the DISH Parties and their officers, agents, servants, and employees and all those in

16  active concert or participation with them, from directly committing, aiding,

17  encouraging, enabling, inducing, causing, materially contributing to, or otherwise

18  facilitating the unauthorized reproduction or distribution of the FOX Programs

19  without consent;

20      2.   For a Declaratory Judgment under 28 U.S.C. §§ 2201(a) and 2202, that

21  the DISH Parties have infringed FOX's copyrights in violation of 17 U.S.C. § 101,

22  et seq. through the conduct alleged herein;

23      3.   For an award of disgorgement and statutory damages, costs, and

24  reasonable attorneys' fees in accordance with 17 U.S.C. §§ 504 and 505 and other

25  applicable law;

26      4.   For specific performance for breach of contract and breach of the

27  implied covenant of good faith and fair dealing in an amount to be determined at

28  trial; and

1

    5.      For such other relief as the Court may deem just and proper.

2

3   DATED: February 19, 2013          JENNER & BLOCK LLP

4

5

6                               By: _____

                                  Richard L. Stone

7

8                                Attorneys for Plaintiffs
                                Fox Broadcasting Company,

9                                Twentieth Century Fox Film Corp.,
                                and Fox Television Holdings, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2172554 2

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demand a jury trial.

3

4

DATED:  February 19, 2013                    JENNER & BLOCK LLP

5

6

7                                                     By: _____

8                                                           Richard L. Stone

9                                                           Attorneys for Plaintiffs
10                                                        Fox Broadcasting Company,
                                                          Twentieth Century Fox Film Corp.,
11                                                       and Fox Television Holdings, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 26 -

2172554.2

# EXHIBIT A

Case 2:12-cv-04529-DMG-SH   Document 138-1   Filed 02/22/13   Page 13 of 14   Page ID #:4026

**Illustrative Copyright Registrations**

| No. | Program Title | Broadcast Date | Copyright Owner | Screenplay Registration[1] | Broadcast Station |
|---|---|---|---|---|---|
| 1. | American Dad; "Toy Whorey" | 05/13/2012 | Twentieth Century Fox Film Corporation | PAU-3-536-825 | FBC |
| 2. | Bob's Burgers; "Bad Tina" | 05/13/2012 | Twentieth Century Fox Film Corporation | PAU-3-588-234 | FBC |
| 3. | Bob's Burgers; "Beefsquatch" | 05/20/2012 | Twentieth Century Fox Film Corporation | PAU-3-588-236 | FBC |
| 4. | Bones; "The Past in the Present" | 05/14/2012 | Twentieth Century Fox Film Corporation | PAU-3-611-816 | FBC |
| 5. | The Cleveland Show; "Mama Drama" | 05/13/2012 | Twentieth Century Fox Film Corporation | PAU-3-547-800 | FBC |
| 6. | The Cleveland Show; "All You Can Eat" | 05/20/2012 | Twentieth Century Fox Film Corporation | PAU-3-571-939 | FBC |
| 7. | Family Guy; "Tea Peter" | 05/13/2012 | Twentieth Century Fox Film Corporation | PAU-3-544-437 | FBC |
| 8. | Family Guy; "Family Guy Viewer Mail #2" | 05/20/2012 | Twentieth Century Fox Film Corporation | PAU-3-560-983 | FBC |
| 9. | Family Guy; "Internal Affairs" | 05/20/2012 | Twentieth Century Fox Film Corporation | PAU-3-560-985 | FBC |
| 10. | Glee; "Props" | 05/15/2012 | Twentieth Century Fox Film Corporation | PAU-3-611-825 | FBC |
| 11. | The Simpsons; "How I Wet Your Mother" | 05/13/2012 | Twentieth Century Fox Film Corporation | PAU-3-571-923 | FBC |
| 12. | The Simpsons; "Ned 'N Edna's Blend Agenda" | 05/13/2012 | Twentieth Century Fox Film Corporation | PAU-3-586-023 | FBC |

---

[1] Audiovisual applications pending.

2103684 3

EXHIBIT A
27

| No. | Program Title | Broadcast Date | Copyright Owner | Screenplay Registration[1] | Broadcast Station |
|-----|---------------|----------------|-----------------|---------------------------|-------------------|
| 13. | The Simpsons; "At Long Last Leave" | 05/20/2012 | Twentieth Century Fox Film Corporation | PAU-3-571-922 | FBC |
| 14. | The Simpsons; "Lisa Goes Gaga" | 05/20/2012 | Twentieth Century Fox Film Corporation | PAU-3-576-622 | FBC |
| 15. | Touch; "Music of the Spheres" | 05/10/2012 | Twentieth Century Fox Film Corporation | PAU-3-606-242 | FBC |
| 16. | Touch: "Tesselations" | 05/17/2012 | Twentieth Century Fox Film Corporation | PAU-3-612-007 | FBC |

EXHIBIT A
28

CHAMBERS COPY

JENNER & BLOCK LLP
Richard L. Stone (Bar No. 110022)
633 W. Fifth St., Suite 3600
Los Angeles, CA 90071
(213) 239-5100

FOR OFFICE USE ONLY

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Fox Broadcasting Company, Twentieth Century Fox Film Corporation, and Fox Television Holdings, Inc., | CASE NUMBER |
| PLAINTIFF(S) | 2:12-cv-04529-DMG-SH |
| v. | |
| Dish Network L.L.C., Dish Network Corporation, and EchoStar Technologies, L.L.C. | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): FOR OFFICE USE ONLY

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☑ ____First____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Richard L. Stone_____, whose address is _633 W. Fifth St., Suite 3600, Los Angeles, CA 90071_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

FEB 2 2 2013

Dated: _____

Clerk, U.S. District Court

By: _____
         Deputy Clerk   ANDRES PEDRO

(Seal of the Court)

FOR OFFICE USE ONLY

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

FOR OFFICE USE ONLY

CV-01A (10/11)                                    SUMMONS