**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-00832-PAB-KLM
Associated with Southern District of New York Civil Action No. 12 Civ. 1540 (AJN)
(consolidated)

DISH NETWORK L.L.C.,

     *Non-Party Movant,*

v.

WNET,
THIRTEEN,
FOX TELEVISION STATIONS, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
WPIX, INC.,
UNIVISION TELEVISION GROUP, INC.,
THE UNIVISION NETWORK LIMITED PARTNERSHIP, and
PUBLIC BROADCASTING SERVICE,

     *Respondents.*

---

## SECOND SUPPLEMENTAL DECLARATION OF ELYSE D. ECHTMAN

---

I, Elyse D. Echtman, declare:

    1.    I am a partner with the law firm of Orrick, Herrington & Sutcliffe LLP, attorneys

for DISH Network L.L.C. ("DISH").  Except where otherwise noted, I have personal knowledge

of the facts stated in this declaration.

    2.    I submit this declaration in support of Non-Party DISH Network L.L.C.'s Motion

to Quash Subpoenas.

    3.    Attached hereto as Exhibit 1 is a copy of Plaintiffs' Memorandum of Law

Pursuant to Magistrate Judge Pitman's February 26, 2013 Order Regarding Briefing on

1

Discovery Pertaining to Plaintiffs' Claims for Statutory Damages and Aereo's Fair Use Defense dated March 19, 2013, and filed by Respondents in their underlying litigation against Aereo, Inc. pending in the Southern District of New York.

4.     Attached hereto as Exhibit 2 is a copy of Plaintiffs' Responses to Aereo, Inc.'s Objections to Magistrate Judge Pitman's Rulings on Discovery Disputes dated April 23, 2013, and filed by Respondents in the underlying action in the Southern District of New York.

5.     Attached hereto as Exhibit 3 is an excerpt of the transcript of the hearing on Respondents' motion for a preliminary injunction that took place before Judge Alison J. Nathan in the underlying action on May 31, 2012.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th of June, 2013, at New York, New York

_____
/Elyse D. Echtman

## CERTIFICATE OF SERVICE

I hereby certify that on this June 18, 2013, a true and correct copy of the foregoing SECOND SUPPLEMENTAL DECLARATION OF ELYSE D. ECHTMAN was filed with the court and served via ECF on:

Sean Robert Gallagher
Polsinelli PC-Denver
1515 Wynkoop #600
Denver, CO 80202-1130
Telephone: 720-931-1163
Fax: 720-221-0837
Email: sgallagher@polsinelli.com

*Attorneys for Respondents*

Jason M. Bernstein
Managing Clerk
Orrick Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
Telephone: 212-506-5388
jbernstein@orrick.com

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WNET, THIRTEEN. FOX TELEVISION STATIONS, INC.. TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, and PUBLIC BROADCASTING SERVICE, | ) ) ) ) ) ECF Case ) ) ) Case No. 12-civ-1540 [Consolidated] |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| AEREO, INC. f/k/a BAMBOOM LABS, INC., | ) ) ) |
| *Defendant.* | ) ) ) ) |

**PLAINTIFFS' MEMORANDUM OF LAW PURSUANT TO MAGISTRATE JUDGE
PITMAN'S FEBRUARY 26, 2013 ORDER REGARDING BRIEFING ON DISCOVERY
PERTAINING TO PLAINTIFFS' CLAIM FOR STATUTORY DAMAGES AND
AEREO'S FAIR USE DEFENSE**
*(Redacted Public Filing)*

## I.    Introduction

Aereo's motion to compel should be denied (1) because Aereo's discovery requests are overbroad, voluminous and seek documents irrelevant under the substantive law, and it has refused all attempts at reaching a rational compromise, (2) because Plaintiffs have agreed to produce, and have produced, broad categories of documents responsive to almost all of Aereo's requests and (3) Aereo has offered no explanation why this production is inadequate or why the documents Aereo seeks are necessary or relevant.  Further production would be unduly burdensome and unwarranted in relation to the marginal relevance, if any, of the documents Aereo continues to seek.

Specifically, in response to Aereo's 92 overly broad requests, Plaintiffs have agreed to produce all of the following documents to the extent they exist:  (a) documents referring to Aereo and its founder; (b) proof of Plaintiffs' ownership of the copyrights at issue; (c) schedules of shows Plaintiffs aired and Aereo retransmitted; (d) documents that evidence any damages Plaintiffs have suffered due to Aereo; (e) retransmission agreements covering the geographic region in suit, and updates thereto; (f) documents reflecting negotiations of the retransmission consent agreements and license agreements that refer to Aereo or other unauthorized broadcast television Internet retransmission services (*i.e.*, FilmOn, Aereokiller, ivi ("Aereo-like Services")); (g) agreements for licensing the infringed works for performance over the Internet or on mobile devices in existence from Aereo's launch to present[1]; (h) documents reflecting the impact of Aereo on Dyle (the mobile distribution system developed by some of the Plaintiffs for their copyrighted content); (i) reports reflecting viewership of Plaintiffs' works in homes, online

---

[1] The ABC Plaintiffs agreed to produce license agreements with Apple, Netflix, Hulu and Amazon.  Hulu, Amazon and Netflix, however, have objected to the production of their agreements by any of the Plaintiffs.  Apple requires an amendment to the protective order before its agreements may be produced by Plaintiffs.

or via mobile devices in 2011 and 2012; (j) Plaintiffs' annual advertising or underwriting (for the non-profit Plaintiffs) revenues for broadcast channels for 2011 and 2012; (k)*Redacted*

(l) market research reports pertaining to various aspects of Internet or mobile devices and remote DVRs; and (m) all other documents that Plaintiffs have identified as supporting their claims, including their claim for statutory damages.[2] This is all in addition to declarations and testimony from Plaintiffs' witnesses during the preliminary injunction proceeding. Aereo claims, without any support, that the discovery it seeks is "commonly produced in copyright litigation as a matter of course." Aereo Br. 1. As explained below, the opposite is true.

In particular, as it affects the key issue of fair use "market harm" (and the related concept of irreparable harm, already found on the preliminary injunction record), Plaintiffs have agreed to produce multiple documents that establish both the existence of relevant markets and how they are harmed by Aereo, Aereo-like Services and others, if Aereo's business model becomes widespread. Aereo asserts it needs further discovery as to multiple other technologies for the claimed purpose of assessing "how Aereo technology harms [Plaintiffs] in a way that is different than existing technologies acknowledged to be legal." Aereo Br. at 4. Indeed, Aereo's principal argument appears to be that "market harm" can be judged only by harms it causes that are somehow *different* in kind from other technologies that preceded it. *See, e.g.*, Aereo Br. at 4, 5, 8, 10, 11 n.13, 12, 13, 14. The fair use "market harm" inquiry, however, is different: it asks whether the unauthorized use at issue, if it were to become widespread, would harm the value or market for the copyrighted works. *See, e.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569,

---

[2] The specifics are identified in the letter from J. Shepard 2/1/13 letter to Judge Nathan ("Shepard Letter") and the chart attached as Exhibit A to the declaration of Julie Shepard. Unless otherwise noted, all exhibits to Plaintiffs' brief are attached to the Shepard declaration.

2

590 (1994). Plaintiffs are not aware of a single case – and Aereo does not cite any case –

suggesting that technologies used by individual consumers have any relevance to the "market

harm" caused by a commercial service, such as Aereo. In fact, Second Circuit law holds to the

contrary. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108, 112 (2d Cir. 1999) (commercial

service cannot "stand in the shoes" of its customers for fair use purposes).[3]  In seeking

documents about consumer technologies, Aereo misstates the law when it claims that consumer

technologies are relevant because its subscribers are simply locating home television equipment

remotely. Aereo Br. 2. The issue is not what consumers do. It is what Aereo does. The

documents relating to consumer devices that Aereo seeks –beyond what Plaintiffs already have

agreed to produce – are simply irrelevant.

As to statutory damages, Courts repeatedly have recognized the discovery-limiting effect

of a plaintiffs' election of statutory damages. Moreover, the detailed program-by-program,

accounting-level profit and expense documents that Aereo seeks also are not relevant. For

example, Aereo asks for revenue, profit and expense information broken down on a per program,

per month, per source, per platform basis. *See* Aereo Br. 12. Aereo is retransmitting dozens of

Plaintiffs' programs on a daily basis. This request would impose an extraordinary burden and

require the collection of an enormous amount of commercially-sensitive data.[4]  Plaintiffs already

have agreed to produce all documents that evidence any damages suffered due to Aereo.

---

[3] Courts other than the Second Circuit have held the same. *See Princeton Univ. Press. v. Mich. Doc. Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (distinguishing copying "performed on a profit-making basis by a commercial enterprise" and copying performed by consumers for "nonprofit or noncommercial uses.").

[4] Illustrating Aereo's unreasonableness, when Plaintiffs sought documents related to Aereo's revenues and profits (which are directly relevant to statutory damages), Aereo objected to producing the detailed documents it now demands of Plaintiffs. Plaintiffs then did what litigants are supposed to do: they compromised and agreed to accept the very sort of higher level documentation that Plaintiffs have agreed to produce to Aereo.

Finally, Aereo's brief ignores that Plaintiffs have already agreed to produce the categories of documents noted above. This is not an oversight; to the contrary, only by this omission is Aereo able to avoid addressing the two key questions before the Court: (1) whether the *additional* documents in dispute are relevant to the legal issues; and (2) whether the marginal relevance, if any, of these *additional* documents would be outweighed by the undue burden of producing them.

Aereo avoids these questions because, fundamentally, Aereo's demands violate the cardinal rule of discovery that the burden imposed by document requests cannot outweigh their relevance, *see* Fed. R. Civ. P. 26(b)(2)(C)(iii), and that relevance must be decided under applicable law. *See U.S. E. Telecomms., Inc. v. U.S. W. Info. Sys., Inc.*, No. 87-cv-2924, 1993 WL 385810 at *31 (S.D.N.Y. Sept. 30, 1993) ("Relevance [for purposes of admissibility] will depend in large part on the controlling substantive law."); *see also WLR Foods, Inc. v. Tyson Foods, Inc.*, 65 F.3d 1172, 1184 (4th Cir. 1995) ("[R]elevance under Rule 26 must be determined by reference to the substantive law which forms the basis of [the parties'] claims and defenses."). Here, the burden imposed by having to produce the additional documents Aereo demands plainly outweighs their marginal relevance, if any.[5]

## II.   Plaintiffs Already Have Agreed To Provide All Documents Properly Within The Scope Of Discovery Potentially Relevant To Aereo's Fair Use Defense

No one disputes that an analysis of the fourth fair use factor will involve a market harm inquiry, but that analysis asks: Does Aereo now – or would the widespread adoption of Aereo and other unauthorized Internet television retransmission services like Aereo, *i.e.*, FilmOn, ivi and Aereokiller – result in a harm to one or more of the actual or potential markets for Plaintiffs'

---

[5] "Burden" includes not only "the time or expense required to respond to requested discovery" but also "the adverse consequences of the disclosure of sensitive, albeit unprivileged, material." *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562 (S.D.N.Y. 1996).

broadcast programming? *See, e.g., Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 575-76 (1994). Identifying the markets that Aereo and Aereo-like Services would adversely affect if such services became widespread is necessary for purposes of determining what discovery may be relevant, but the documents Aereo seeks go far beyond that.

Aereo operates as a commercial service that captures, records and retransmits Plaintiffs' local television broadcasts to Aereo subscribers for daily, monthly or yearly fees. Aereo markets its service as an alternative to cable television and, in its own words, seeks to *REDACTED*

Exs. B, C. Aereo touts that its Internet television service is something never before offered with the tag line: ***Redacted*** Ex. D (emphasis added). *See also* Ex. E***Redacted*** Aereo subscribers can watch Plaintiffs' television programs while they are being broadcast live on smart phones, laptops, iPads and Internet-enabled TVs, among many other devices. Aereo also records Plaintiffs' programming for Aereo's subscribers later viewing on these same type of devices. There can be little doubt that – by offering the same content provided by Plaintiffs and their licensees, but at a discounted price that is much lower than cable subscription fees because Aereo avoids paying for the right to retransmit – if Aereo-like Services become widespread, they will cause harm to Plaintiffs' markets for their works.

There are multiple existing (as well as potential) markets for Plaintiffs' programs that are and will be harmed by Aereo and Aereo-like Services. They include the market for rights to retransmit Plaintiffs' live television broadcasts. Cable and satellite companies pay to retransmit Plaintiffs' copyrighted works. Aereo's own documents show Aereo's potential to harm this market by encouraging television viewers to cancel their television subscriptions (also known as cord cutting). *See, e.g.,* Ex. F. The markets also include licensing the works for live or

5

subsequent viewing via the Internet or on mobile devices and streaming of the works on

Plaintiffs' own websites. *See* Hosp Decl., Ex. 8, ¶¶ 15-16, 18. Again, Aereo's own documents

demonstrate the harm it poses to this market: ***Redacted***

Plaintiffs are entering the mobile distribution market, including through a system known as Dyle.

Here too, Aereo's documents reflect that Aereo's service competes in the same market as Dyle.

*See* Ex. H. In fact, every court, including this one, has found that the unauthorized

retransmission of Plaintiffs' television programming will not only cause market harm, but this

harm is irreparable.[6] Aereo recently announced that it has raised an additional $38 million in

funding for expansion into 22 additional markets. Aereo is Expanding!, http://blog.aereo.com

(Jan. 8, 2013). This investment and its future expansion make clear that Aereo itself believes

there are valuable markets in which it intends to enter to compete directly with Plaintiffs.

Plaintiffs have agreed to produce to Aereo (and in most cases already have produced) the

following documents which encompass relevant documents related to the foregoing markets: (1)

retransmission agreements for the New York City Designated Marketing or NYC DMA, which is

the only area where Aereo currently operates;[7] (2)***Redacted***

---

[6] *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285-87 (2d Cir. 2012) ("*ivi*"); *Aereo*, 874 F. Supp. 2d
at 397-400 ("The evidence establishes that Plaintiffs will suffer irreparable harm in the absence
of a preliminary injunction. Plaintiffs have identified a number of categories of irreparable harm,
several of which have been accepted in similar cases [such as *ivi*] as supporting the issuance of a
preliminary injunction."); *Fox Television Stations, Inc. v. BarryDriller Content Systems, PLC*,
CV 12-6921-GW JCX, 2012 WL 6784498, *6 (C.D. Cal. Dec. 27, 2012) ("*Aereokiller*"). None
of these courts relied on the type of discovery Aereo seeks to compel.

[7] Plaintiffs collectively have produced over 140 retransmission consent agreements. Aereo has
raised objections regarding some limited redactions that were made to some of the agreements
produced. However, the production of any redacted agreements is in compliance with the
Court's order requiring Plaintiffs to produce retransmission consent agreements.

multiple major Internet video delivery services, including Hulu, iTunes, Amazon and Netflix, among others, for performance of the works over the Internet or on mobile devices through subscription video-on-demand services (SVOD) like Hulu Plus, Hulu and Netflix or for purchase over the Internet (called digital download) like Amazon;[8] (3) documents relating to negotiations of retransmission consent agreements and license agreements that refer to Aereo and Aereo-like Services; (4) documents reflecting the impact of Aereo on the potential market for Dyle and (5) reports reflecting viewership of Plaintiffs' works in homes, online or via mobile devices in 2011 and 2012 from Nielsen (which measures in-home viewing) and from Google Analytics and ComScore (which provide website tracking information).

Aereo does not even attempt to explain how any of the documents Aereo now seeks are needed to establish the relevant issues of whether these markets exist and will be harmed if unauthorized retransmission services such as Aereo's become widespread. Instead, it tries to recast the inquiry into some kind of a competitive harm analysis that has no basis in the fourth

---

The sections redacted by the WNET Plaintiffs do not deal with retransmission consent for broadcast television. To the contrary, the redacted provisions concern carriage of cable channels (an entirely different set of programming not at issue in this case). Given that such channels are not the subject of retransmission consent, are not transmitted over-the-air and are not being retransmitted by Aereo, these portions are irrelevant and not required to be produced under this Court's April 13, 2012 Order or Aereo's request. *Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03-5560, 2007 WL 473726, at \*3 (S.D.N.Y. Feb. 14, 2007) (Pitman, J.) (denying motion to compel production of an unredacted document because the party had not "established that the redacted portions" of the document were "responsive to their discovery requests"). Similarly, the ABC Plaintiffs have only redacted portions that concern carriage of cable channels and select provisions pertaining to commercially-sensitive matters not at issue in this case. Plaintiffs will bring unredacted and redacted exemplars of retransmission consent agreements to the March 21 hearing should the Court wish to review them.

[8]  The terms pursuant to which Plaintiffs' programming is offered by their licensees is available on the websites such as Hulu, iTunes, Amazon and Netflix. As specific terms of the license agreements themselves are not at issue, this publicly available information sufficiently identifies the existing markets. Nevertheless, to attempt to resolve its discovery disputes with Aereo, Plaintiffs agreed to produce redacted representative license agreements.

fair use factor. *See* Aereo Br., p. 9-10 ("evidence of how Aereo technology-versus other related technology-caused harmed harm is of great relevance"), p. 13 ("Without information related to other technologies, it is impossible to determine what allegedly has been caused by Aereo rather than by different technologies, by competition from other sources, or by other distribution platforms.")

Aereo's purported justifications are incorrect. Under the market harm fair use analysis, the harm caused by Aereo (were its services to become widespread) is not affected by harms that other technologies might cause. The fourth fair use factor concerns "the extent of market harm caused <u>by the particular actions of the alleged infringer</u>." *Campbell*, 510 U.S. at 590 (emphasis added). Indeed, courts have rejected the very notion that this analysis is influenced by the harm caused by entities other than defendant. *See Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d, 217, 231 (D. Mass. 2009) (rejecting defendant's argument that his infringement/file sharing made little economic difference because the songs were popular and available on Kazaa (another infringing site), holding "that is not the framework for this analysis"); *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 11 F. Supp. 2d, 329 (S.D.N.Y. 1998) (rejecting the defendant's argument that plaintiffs' lack of action against other allegedly infringing works indicated that the defendant's infringing work would not damage a potential market; "the lack of earlier litigation against other similar works is simply irrelevant").

Aereo also is wrong when it claims the market harm analysis mandates production of documents enabling a calculation of actual damages. Indeed, the fourth fair use factor does not require a showing of actual damages. *See, e.g., Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417, 449 (1984). A plaintiff need not quantify harm it would suffer. *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997) (reversing the district court's fourth

8

factor analysis because the district court "confuse[d the] lack of one item of specific damages with lack of adverse impact on a potential market," and holding that the copyright owner was "not required to show a decline in the number of licensing requests" after the alleged infringement for the fourth factor to weigh in her favor); *Marcus v. Rowley,* 695 F.2d 1171, 1177 (9th Cir. 1983) (in fourth factor analyses, "mere absence of measurable pecuniary damage does not require a finding of fair use"). For all of these reasons, neither detailed dollar amounts nor distinguishing the harm Aereo causes from "other" technologies (*e.g.,* DVRs, dongles, Slingbox) is relevant.[9]

Aereo's argument that documents relating to consumer technologies are relevant because a consumer's use might be fair is a red herring. *See* Aereo Br., 4-5, 10 n.12. Even assuming *arguendo* that Aereo can establish that a consumers' fair use defense applies because Aereo can only be held secondarily liable, it does not change the fact that the market harm analysis remains essentially the same: whether unrestricted and widespread conduct of the sort engaged in by the Aereo subscriber (*e.g.,* copying Plaintiffs' broadcast programming for retransmission over the Internet) will likely have an adverse impact on Plaintiffs' legitimate markets. *See, e.g., Tenenbaum,* 672 F. Supp. 2d. at 217 (denying fair use defense asserted by individual engaged in unauthorized file sharing who alleged his use was non-commercial). Contrary to what Aereo claims, it is not a Radio Shack renting or selling equipment to an end-user. *See* 2/25 Tr. 45:15-19 (Hosp Arg.). Aereo is a commercial service and is in no way analogous to consumers using home equipment. *See Kirkwood,* 150 F.3d at 108, 112. Consumer use of home equipment has no bearing on whether a commercial service like Aereo, which is positioned to displace

---

[9] Judge Nathan already recognized in the context of a privilege log dispute that logging privileged outside counsel documents relating to the ill-defined concept of "similar technologies" would be "unduly burdensome." 1/11/13 Order, Dkt. 128, at 3. The burden of producing all documents about to such a vaguely-defined set of "similar technologies" would be even greater.

Plaintiffs' authorized licensees, causes harm.[10] Moreover, whether assessed under direct liability or secondary liability, the impacted markets remain the same and the scope of discovery remains the same.

Nonetheless, in the spirit of compromise, Plaintiffs also agreed to produce certain market research reports related to consumer technologies such as market research reports business forecasts or similar analyses that they commissioned or prepared in 2011 or 2012 pertaining to various aspects of remote DVRs (an aspect of the service Aereo offers) and viewing over the Internet, mobile devices and antennas. *See* Shepard Letter, pp. 4-5. For example, the WNET Plaintiffs agreed to produce reports regarding (a) market harm or impact from Slingbox; (b) remote DVRs and time-shifting via remote DVRs; (c) the use of any of the infringed works on any mobile device or via remote DVR; and (d) the number of people who watched broadcast television via over-the-air antennas in 2011 and 2012. *Id.* Similarly, the ABC Plaintiffs agreed to produce any market research, business forecasts or similar analyses created or commissioned in 2011 or 2012, for the purpose of assisting Plaintiffs to make business decisions, based on the impact of remote-storage DVRs, Slingbox, Aereo, and Aereo-like Services on the economics of Plaintiffs' domestic over-the-air retransmission, online and mobile markets for their broadcast programs.

Both sets of Plaintiffs also have produced voluminous Nielsen reports for 2011 and 2012.

---

[10] Aereo attempts to obfuscate the issue by invoking *Sony*. The *Sony* Court did not hold, as Aereo claims, that any personal or in-home use of a recording device was a fair use. *See* Aereo Br. 2-3. Rather, the Supreme Court very carefully limited its fair use analysis to a narrowly prescribed definition of time-shifting, a practice which the Court found (under the record presented) did not adversely affect the market for the works. Unauthorized copying that substitutes for licensed copies, however, are not protected as fair uses. *E.g.*, *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 323 (2d Cir. 1995) (rejecting *Sony*-based fair-use defense where defendant's unlicensed uses provided value to defendants "apart from time-shifting"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 647 (7th Cir. 2003) (unauthorized copying for purposes of library building or commercial skipping is "unquestionably infringing").

The data produced captures not only live viewing metrics, but also reports on the number of consumers viewing Plaintiffs' broadcast programming over DVRs. In the industry, these numbers are called "live same day" (time delayed viewing the same of day of broadcast) and "Live +3," "Live +5" and "Live +7" (which means total viewing or programming 3, 5 or 7 days after the live broadcast). Also, where available, Plaintiffs have produced Nielsen C3 metrics. C3 quantifies the average number of commercials viewed during a particular program when it airs on standard television and for the next three days (in order to capture data from viewers who watch the program later on their DVRs). Due to advertisers' reliance on Nielsen's C3 metrics, it is essentially the currency by which advertising sales are made.[11]

Aereo ignores that Plaintiffs have produced, or agreed to produce, all of these document because doing so puts the focus on the unreasonableness of Aereo's demands for *additional* documents. Here, Aereo insists on not only the market reports regarding "similar technologies" (regardless of who prepared them and whether they were solicited by Plaintiffs), but also <u>any communications</u> about such reports from Plaintiffs, all of which are involved in the media and broadcast television industry and have hundreds and, in some cases, thousands of employees.

In addition to seeking irrelevant documents about other technologies, Aereo's demands are unduly burdensome. This case is about whether <u>Aereo's service</u>, which Aereo says is sui generis (*see, e.g.*, Exs. D, E), is infringing in part because, if it becomes widespread, it will harm the markets for Plaintiffs' works. Requiring Plaintiffs to search for responsive documents – using such terms like "DVR" or "on-demand," which are part of the daily parlance in the television industry – will result in having to sift through hundreds of thousands of non-responsive documents. *See* Shepard Decl., ¶¶ 12-13. This burden is undue even if the search

---

[11] Aereo also has made a demand for "Ad-Skipping" documents. Aereo Br. 14. But such documents are irrelevant as Aereo's technology does not enable "ad-skipping."

were limited to a handful of custodians and is unjustified in light of the voluminous documents Plaintiffs have already provided to Aereo.

### III.   Plaintiffs Have Already Agreed To Produce All Documents Properly Within The Scope Of Discovery For A Statutory Damages Claim

Copyright owners may elect statutory damages "precisely because of the difficulties inherent in proving actual damages and profits" given the number of factors other than a single infringer's actions that can influence the commercial success of a given work. *Yurman Design, Inc. v. PAJ, Inc.*, 93 F. Supp. 2d 449, 462 (S.D.N.Y. 2000), *aff'd in part, rev'd in part by*, 262 F.3d 101 (2d Cir. 2001); *accord Nat'l Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d 458, 472 (S.D.N.Y. 2001).

Plaintiffs have elected statutory damages. They have, as noted, produced gross advertising revenue, Nielsen data, retransmission agreements and other documents reflecting the harm caused or likely to be caused by Aereo and Aereo-like services. *Redacted*

Aereo – without explaining why the substantial production Plaintiffs have already made is inadequate to demonstrate the existence of and harm to the relevant markets if Aereo-like Services become widespread – demands more, including additional documents pertaining to 10 years' worth of highly detailed commercially sensitive revenue, profit and expense information related to advertising, retransmission consent and licensing on a work-by-work basis. *See, e.g.*, Aereo Br. 7 n. 11, 12. Aereo has not explained, and cannot explain, how such information could be relevant. That is particularly so because Aereo has *Redacted* subscribers and Plaintiffs are not asserting that it presently causes measurable, quantifiable harm that would be reflected in such information. Moreover, due to "the plethora of other factors impacting profitability" (*e.g.*,

increased production cost, upswings (or downturns) in popularity of a work, seasonal viewership fluctuations), the requested data would not help in the calculation of damages, but it would be incredibly burdensome to collect. *See Capitol Records, Inc. v. MP3Tunes, LLC*, No. 07-cv-9931 WHP-FM (S.D.N.Y. April 12, 2010), ECF No. 168, pp. 2-3 (affirming denial of profit discovery; noting actual damages discovery would be of limited utility where statutory damages had been elected and defendants had failed to articulate "how they would be able to take historical profitability data, screen out the plethora of other factors impacting profitability – including internet piracy by parties other than defendants – and calculate actual damages"); *Arista Records LLC v. Lime Grp. LLC*, 06 CV 5936 KMW, 2011 WL 1486640, at *2-3 (S.D.N.Y. Apr. 11, 2011) ("Had Plaintiffs been pursuing actual damages rather than statutory damages for their post–1972 sound recordings, Defendants likely would have been entitled to greater profits and cost-based discovery."); *see also id.* at *2 n.2 (noting defendants were "denied royalty, profit, and cost information").[12]

Aereo's cases do not support an order requiring Plaintiffs to produce any additional revenue, profit or damage documents under the vague theory that they are relevant to Plaintiffs' claim for statutory damages. *Kleiner v. Burns* is irrelevant because Plaintiffs already agreed to produce any documents evidencing their damages due to Aereo. Fed. R. Serv. 3d 644, 2000 WL 1909470 (D. Kan. Dec. 15, 2000). Discovery of damages due to the defendant is what the *Kleiner* court ordered and is what Plaintiffs agreed to here. *Id.* at *3, n. 2. Nothing in the *UMG* order attached to the Hosp declaration suggests that the information Plaintiffs have already

---

[12] *See, also, Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 926, 929 (N.D. Cal. 2009) ("[n]otably, the [statutory damages] factors include the *profits reaped by defendant and the revenues lost by plaintiff, not the plaintiff's profits.*"); *IO Grp., Inc. v. GLBT Ltd.*, C-10-01282 MMC DMR, 2011 WL 3443773 (N.D. Cal. Aug. 8, 2011) (denying motion to compel concerning the plaintiffs' profits and revenues earned; "[A]s the alleged infringer, it is Defendant's profits related to the alleged infringed works, and not Plaintiffs', that are relevant to the issue of actual damages.")

agreed to provide does not equate with the type of <u>summary</u> information the *UMG* court ordered produced or to suggest that this outlier decision has any application here.[13]

## IV.  <u>Plaintiffs Have Produced All Documents Properly Within The Scope Of Discovery For Irreparable Harm</u>

Judge Nathan already has found that Aereo's service would cause irreparable harm absent an injunction. *See Aereo*, 874 F. Supp. 2d at 397-400. The Second Circuit affirmed a finding that ivi –another service that retransmitted Plaintiffs' television programming without authorization until enjoined – caused Plaintiffs irreparable harm. *ivi*, 691 F.3d at, 285-87. Likewise, Aereokiller, a copycat unauthorized Internet broadcast retransmission service of Aereo, was recently preliminarily enjoined after the court found that it caused the broadcast plaintiffs there (some of whom are Plaintiffs here) irreparable injury. *See Aereokiller,* CV 12-6921-GW JCX, 2012 WL 6784498 at *6. The same evidence that supported Judge Nathan's finding of irreparable harm can also show that Aereo causes market harm under the fourth fair use factor. *See Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 550-53 (S.D.N.Y. 2008) (evidence of irreparable harm used to find market harm).

Contrary to Aereo's assertions, Plaintiffs have agreed to produce and have produced the discovery necessary for Aereo to challenge Plaintiffs' testimony as to the irreparable harm Aereo causes to various of Plaintiffs' markets including their retransmission agreements, Internet and mobile licensing agreements, and advertising revenues.[14]

## V.  <u>Conclusion</u>

Plaintiffs have already provided Aereo with all potentially relevant information and then

---

[13]  Aereo's other cases did not concern motions to compel or the scope of permissible discovery where statutory damages were elected.

[14] Aereo suggests that the ABC Plaintiffs have withheld research conducted by NBCUniversal in connection with how consumers watched the Olympics, but has omitted telling the Court that the ABC Plaintiffs have already produced these reports. *See* DNC0043339-DNC0043439.

some. They have produced far more than any court has required in similar infringement actions against other Aereo-like Services. Aereo has failed to demonstrate why this production is inadequate, the legal relevance of the documents it seeks, or identified any potential need that outweighs the substantial burden that its additional demands would impose on Plaintiffs. Aereo's motion to compel Plaintiffs to produce additional documents should be denied.

Dated:  March 19, 2013

  /s/ Steven B. Fabrizio
Steven B. Fabrizio (No. SF-8639)
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
Telephone (202) 639-6000
Facsimile (202) 639-6066
sfabrizio@jenner.com
swilkens@jenner.com

Richard L. Stone
Kenneth D. Klein
Julie A. Shepard
JENNER & BLOCK LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071-2054
Telephone (213) 239-5100
Facsimile (213) 239-5199

*Attorneys for Plaintiffs WNET, THIRTEEN,*
*Fox Television Stations, Inc., Twentieth*
*Century Fox Film Corporation, WPIX,*
*Inc., Univision Television Group, Inc., The*
*Univision Network Limited Partnership,*
*and Public Broadcasting Service*

  /s/ Bruce P. Keller
Bruce P. Keller
Michael R. Potenza
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6200
bpkeller@debevoise.com
mpotenza@debevoise.com

*Attorneys for Plaintiffs American*
*Broadcasting Companies, Inc., Disney*
*Enterprises, Inc., CBS Broadcasting Inc.,*
*CBS Studios Inc., NBCUniversal Media,*
*LLC, NBC Studios LLC, Universal Network*
*Television, LLC, Telemundo Network Group*
*LLC, and WNJU-TV Broadcasting LLC*

# Exhibit A

March 19, 2013

| Request # | ABC Plaintiffs' Production | WNET Plaintiffs' Production |
|---|---|---|
| **Documents relating to Aereo** | | |
| 2-11, 13-19, 23-25, 37-41, 50 69, 71, 85, 86 | Responsive, non-privileged documents which mention or concern Aereo, Bamboom and/or Kanojia. | |
| **Documents relating to antennas** | | |
| 2, 12, 15, 18, 20, 21. 26, 27, 39, 86 | Non-privileged documents relating to Aereo. | a) Non-privileged documents relating to Aereo; b) Non-privileged product reports regarding the number of people who watched broadcast television via over-the-air antennas in 2011 and 2012. |
| **Documents relating to DVRs and RS-DVRs** | | |
| 29, 30, 33-36, 76 | a) Non-privileged market research, business forecasts or similar analyses created or commissioned in 2011 or 2012, for the purpose of assisting Plaintiffs' business decisions, based on the impact of RS-DVRs or Slingbox on the economics of Plaintiff's domestic, over-the-air, retransmission, online and mobile markets for their broadcast television programs; b) Documents created in 2011 and 2012 sufficient to describe any RS-DVR technology developed and deployed by the ABC Plaintiffs; c) Nielsen ratings reports that include live broadcast television viewing and C-3 ratings in 2011 and 2012. | a) Non-privileged market research, business forecasts or similar analyses conducted or commissioned by Plaintiffs in 2011 or 2012 that i) measure fast-forwarding of advertising embedded in their programming using a DVR, ii) reports on consumer access to infringed works via remote DVR, iii) relates to remote DVRs and time-shifting via remote DVRs or iv) relates to market harm/impact of Slingbox; b) Non-privileged market research, or technology reviews conducted or commissioned by Plaintiffs or business forecasts prepared by Plaintiffs in 2011 or 2012 regarding the use of the infringed works via remote DVR; c) Documents sufficient to describe any remote DVR technology developed and deployed by Plaintiffs, including what the cost of those services to consumers would be. d) Nielsen reports/data reflecting viewership of broadcast television based on following Nielsen metrics where available in 2011 and 2012: Live, Live-Plus-Same-Day, Live +3, Live +5, Live +7 and C3. |
| **Documents relating to revenue, profits and expenses** | | |
| 20-22, 26-31, 35, 38, 40, 58-60, 62-80 | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television; b) License agreements with iTunes, Hulu, Netflix and Amazon effective after the time | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions unrelated to retransmission consent for broadcast television; b) License agreements for mobile and internet distribution, including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at and after |

|  | Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensings of broadcast television programs;[1]<br><br>c) Documents sufficient to show high-level gross advertising revenue received in 2011 and 2012. | the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensings of broadcast television programs;<br><br>*Redacted*<br>*Redacted*<br>*Redacted*<br><br>d) Gross advertising or underwriting (for the non-profit Plaintiffs) revenues from 2011 and 2012. |
|---|---|---|
| **Documents relating to damages & commercial impact** | | |
| 38, 40, 41, 44-50, 58-60. 61-77, 79, 80 | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>c) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television;<br><br>d) License agreements with iTunes, Hulu, Netflix and Amazon effective after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensings of broadcast television programs;<br><br>e) Documents sufficient to show high-level gross advertising revenue received in 2011 and 2012;<br><br>f) Documents reflecting the adverse impact of Aereo on the potential market for Dyle;<br><br>g) Documents identified to date that evidence damage caused by Aereo. | a) Retransmission consent agreements for the NY DMA that redact provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>c) License agreements for domestic mobile and internet distribution of their works, including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at and after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>d) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo. (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>*Redacted*<br>*Redacted*<br>*Redacted*<br><br>f) Gross advertising or underwriting (for the non-profit Plaintiffs) revenues from 2011 and 2012;<br><br>g) Documents reflecting the adverse impact of Aereo on the potential market for Dyle;<br><br>h) Documents identified to date that evidence damage caused by Aereo. |

---

[1] Plaintiffs are prepared to produce these license agreements pending the outcome of the dispute between Aereo and third-party licensees

2184276 1

| Documents relating to retransmission agreements | | |
|---|---|---|
| 45-50 | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia. | a) Retransmission consent agreements for the NY DMA that redact provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia. |

| Documents relating to license agreements | | |
|---|---|---|
| 34, 44, 58-60, 62, 71 | a) License agreements for domestic mobile and Internet distribution of their works with iTunes, Hulu, Netflix and Amazon effective after the time Aereo launched that redact highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia. | a) License agreements for domestic mobile and internet distribution of their works, including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at and after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>*Redacted* |

| Documents relating to market research | | |
|---|---|---|
| 12, 20-22, 26-31, 35, 63-65, 76, 78-80 | Market research, business forecasts or similar analysis created or commission in 2011 and 2012 for the purpose of making business decisions, based on the impact of RS-DVRs, Slingbox, Aereo and services related to Aereo such as ivi, Aereokiller, Filmon and Zediva, on the economics of the domestic, over the air, retransmission, online and mobile markets for Plaintiffs' broadcast television programs. | a) Non-privileged market research, business forecasts or similar analyses conducted or commissioned in 2011 or 2012 that i) measure fast-forwarding of advertising embedded in their programming using a remote DVR, ii) reports on consumer access to infringed works via remote DVR, iii) relates to remote DVRs and time-shifting via remote DVRs or iv) relates to market harm/impact of Slingbox;<br><br>b) Non-privileged market research, or technology reviews conducted or commissioned by Plaintiffs or business forecasts prepared by Plaintiffs in 2011 or 2012 regarding the use of the infringed works on any mobile device or via remote DVR;<br><br>c) Non-privileged reports regarding the number |

3

| | | of people who watched broadcast televisions via over-the-air antennas in 2011 and 2012;<br><br>d) Reports regarding the number of people who watched broadcast television via OTA antennas in 2011 and 2012. |
|---|---|---|
| **Documents relating to viewership measurement** | | |
| 77-80 | a) Nielsen ratings reports that include live broadcast television viewing and C-3 ratings in 2011 and 2012;<br><br>b) Existing reports sufficient to reflect data received from comScore and/or Google Analytics on the viewers of broadcast channels and/or infringed works in homes, over the Internet or on mobile devices in 2011 and 2012. | a) Nielsen reports/data reflecting viewership of broadcast television based on following Nielsen metrics where available in 2011 and 2012: Live, Live-Plus-Same-Day, Live +3, Live +5, Live +7 and C3;<br><br>b) Existing reports sufficient to reflect data received from comScore and/or Google Analytics on the viewers of broadcast channels and/or infringed works in homes, over the Internet or on mobile devices in 2011 and 2012. |
| **Documents relating to other technologies used to watch television programs** | | |
| 22, 28, 31, 32, 35. 42, 43, 76, 78-80 | a) License agreements for domestic mobile and Internet distribution of their works with iTunes, Hulu, Netflix and Amazon effective after the time Aereo launched that redact highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>c) Market research, business forecasts or similar analysis created or commission in 2011 and 2012 for the purpose of making business decisions, based on the impact of RS-DVRs, Slingbox, Aereo and services related to Aereo such as ivi, Aereokiller, Filmon and Zediva, on the economics of the domestic, over the air, retransmission, online and mobile markets for Plaintiffs' broadcast television programs;<br><br>d) Documents created in 2011 and 2012 sufficient to describe any technology to distribute broadcast television programming to mobile devices over the Internet developed and deployed by the ABC Plaintiffs;<br><br>e) Documents reflecting the adverse impact of | a) License agreements for domestic mobile and internet distribution of their works. including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at or after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx. (4) Alki David, (5) ivi, (6) Aereokiller. (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>*Redacted*<br><br>d) Non-privileged market research reports or analyses commissioned or conducted by Plaintiffs in 2011 or 2012 that relate to the market harm/impact from Slingbox;<br><br>e) Non-privileged market research reports or technology reviews commissioned or conducted by Plaintiffs or business forecasts prepared by Plaintiffs in 2011 or 2012 regarding use of the infringed works on any mobile device;<br><br>f) Documents reflecting the adverse impact of Aereo on the potential market for Dyle. |

4

|  | Aereo on the potential market for Dyle. |  |
|---|---|---|
| **Documents relating to Plaintiffs' Boards of Directors** | | |
| 8 | Non-privileged board minutes discussing Aereo or Bamboom (including documents discussing Chet Kanojia or Barry Diller in relation to Aereo). | |
| **Documents relating to lobbying/communications with the government** | | |
| 53, 84,85 | Communications in 2011 and 2012 with government agencies, representatives of Congress or their staffs regarding Aereo or Bamboom (including Chet Kanojia or Barry Diller). | Lobbying communications that mention Aereo or Bamboom (including Chet Kanojia or Barry Diller). |
| **Documents relating to document retention policies** | | |
| 87 | Document retention policies. | |
| **Documents relating to Plaintiffs' organizational structures** | | |
| 88, 89 | Plaintiffs refer Aereo to the information located at:<br><br>a) http://www.nbcuni.com/corporate;<br><br>b) http://www.cbscorporation.com/ourcompany.php?id=11;<br><br>c) http://thewaltdisneycompany.com/about-disney;<br><br>d) http://www.disneyabctv.com/division/index_executives.shtml. | Current organizational charts to the extent they exist. |
| **Documents relating to ownership of copyrights** | | |
| 51-57, 61 | a) Copyright registration certificates for all works Plaintiff claims Aereo is infringing;<br><br>b) Applications for copyright registrations, to the extent Plaintiffs do not have registrations for the works Aereo is infringing;<br><br>c) Additional documents to the extent Aereo raises a good faith challenge to the ownership of a particular copyright. | |
| **Documents relating to *Cablevision*** | | |
| 82 | No additional documents relating to *Cablevision*. | |

5

# Exhibit B



# Exhibit C

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER          AEREO0214833

# Exhibit D

*Redacted*

*Redacted*

# Exhibit E

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0342489

.

# Exhibit F

# *Redacted*

AEREO0036446

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

*Redacted*

AEREO0036469

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# Exhibit G

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0489482

*Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0489483

# Exhibit H

# *Redacted*

**HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**          **AEREO0218192**

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0218193

# *Redacted*

**HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**                    **AEREO0218194**

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0218195

# *Redacted*

**HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**          **AEREO0218196**

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                   :

AMERICAN BROADCASTING COMPANIES, INC.,  :
DISNEY ENTERPRISES, INC., CBS BROADCASTING  :
INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA,  :
LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK  :
TELEVISION, LLC, TELEMUNDO NETWORK GROUP  :
LLC, and WNJU-TV BROADCASTING LLC,  :
                                   :

       Plaintiffs,                    :

              v.                 :  Case No. 12-civ-1540
                                 :  [consolidated]

AEREO, INC.,                           :

       Defendant.                 :

------------------------------------------------------------------------X
------------------------------------------------------------------------X
                                   :

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC.,  :
TWENTIETH CENTURY FOX FILM CORPORATION,  :
WPIX, INC., UNIVISION TELEVISION GROUP, INC.,  :
THE UNIVISION NETWORK LIMITED PARTNERSHIP,  :
and PUBLIC BROADCATING SERVICE  :
                                   :

       Plaintiffs,                    :

              v.                 :  Case No. 12-civ-1543
AEREO, INC. f/k/a BAMBOOM LABS, INC.,  :

       Defendant.                 :

------------------------------------------------------------------------X

## PLAINTIFFS' RESPONSE TO AEREO, INC.'S OBJECTIONS TO MAGISTRATE JUDGE PITMAN'S RULINGS ON DISCOVERY DISPUTES

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ............................................................................................... 4

DISCUSSION .................................................................................................. 6

I.  Judge Pitman Properly Exercised His Discretion In Limiting Aereo's Overbroad
    and Vague Discovery Requests. .................................................................. 6

    A.  The Contention That Plaintiffs Have Not Produced "Anything" (Obj. at 4)
        Is False. ......................................................................................... 6

    B.  Judge Pitman Correctly Denied Further Discovery into Program-Related
        and Other Financial Information....................................................... 8

    C.  Judge Pitman's Refusal to Grant Wide-Ranging Discovery Relating to
        Similar Technologies, "Like Antennas," Or Transmission Services,
        Whether Licensed Or Not, Was Appropriate...................................... 10

        1.  Under the Relevant Standard, Correctly Applied by Judge Pitman,
            Aereo Has All The Discovery It Needs. ...................................... 11

        2.  Production of Antenna-Related Documents Is Irrelevant And
            Would Be Overwhelmingly Burdensome. ................................... 13

        3.  Discovery Into Licensed Technologies Is Irrelevant to Quantifying
            Harm Because They Can Cause No Harm Relevant to Fair Use........... 14

    D.  The Time Frames For Production Of Documents Are More Than
        Generous And Not Clearly Erroneous. ............................................. 16

    E.  Permitting Redactions To Third-Party License Agreements Was Not
        Clearly Erroneous. ......................................................................... 18

    F.  Judge Pitman Did Not Err In Setting A Discovery Schedule. ............... 19

    CONCLUSION............................................................................................ 20

# TABLE OF AUTHORITIES

CASES

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012) ......................... 12, 13

*Arista Records LLC v. Lime Group LLC*, 06 CV 5936 KMW, 2011 WL 1486640
    (S.D.N.Y. Apr. 11, 2011) ....................................................................................... 9

*Bridgewater v. Taylor*, 745 F. Supp. 2d 355 (S.D.N.Y. 2010) ........................................ 4

*Briese Lichttechnik Vertriebs GmbH v. Langton*, 272 F.R.D. 369 (S.D.N.Y. 2011) ................... 9

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ....................................... 8, 11

*Capitol Records, Inc. v. MP3Tunes, LLC*, No. 07-cv-9931 (S.D.N.Y. April 12,
    2010) .................................................................................................................. 9

*Catskill Dev., LLC v. Park Place Entm't Corp.*, 206 F.R.D. 78 (S.D.N.Y. 2002) ......................... 1

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ........................................................... 13

*Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269 (S.D.N.Y. 1999) ...................... 13

*Flaherty v. Filardi*, 388 F. Supp. 2d 274 (S.D.N.Y. 2005) .............................................. 4

*Fox Television Stations v. Barry Driller Content Sys., PLC*, No. CV 12-6921, 2012
    WL 6784498 (C.D. Cal. Dec. 27, 2012) ............................................................. 12

*Hughes v. Lasalle Bank, N.A.*, No. 02 Civ. 6384, 2004 WL 414828 (S.D.N.Y. Mar.
    4, 2004) ............................................................................................................ 1, 4

*In re Heparin Prods. Liab. Litig.*, 273 F.R.D. 399 (N.D. Ohio 2011) ................................. 18

*Moore v. Publicis Groupe SA*, No. 11-cv-1279, 2012 WL 517207 (S.D.N.Y. Feb.
    14, 2012) ......................................................................................................... 18

*Pkfinans Int'l Corp v. IBJ Schrader Leasing Corp.*, Nos. 93 Civ. 5375 (SAS), 96
    Civ. 1816 (SAS), 1996 WL 675772 (S.D.N.Y. Nov. 21, 1996) .............................. 4

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282
    F.R.D. 76 (S.D.N.Y. 2012) ................................................................................. 4

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ....................................................... 12

*Sheikhan v. Lenox Hill Hosp.*, No. 98 Civ. 6468 (WHP), 1999 WL 386714
(S.D.N.Y. Jun. 11, 1999) ............................................................................................. 4

*Warner Bros. Entm't, Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008) ....................... 12

*Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011) ................ 13

*Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d 327 (2d Cir. 1983) .............................................. 14

*World Wrestling Fed. Entm't, Inc. v. William Morris Agency, Inc.*, 204 F.R.D. 263
(S.D.N.Y. 2001) ............................................................................................................ 1

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) .................................................................... 12

**STATUTES & RULES**

28 U.S.C. § 636(b)(1)(A) ............................................................................................................ 1

Fed. R. Civ. P. 72(a) ..................................................................................................................... 1

Fed. R. Civ. P. 26 ....................................................................................................................... 20

The ABC Plaintiffs and the WNET Plaintiffs (collectively, "Plaintiffs") submit this memorandum in response to the objections filed by Aereo, Inc. ("Aereo") to U.S. Magistrate Judge Henry B. Pitman's March 29, 2013 Order ("Order").  *See* Declaration of Michael R. Potenza ("Potenza Decl.") Ex. 1.

## PRELIMINARY STATEMENT

Nowhere does Aereo cite the standard governing this Court's review of Judge Pitman's Order.  Unless the Order is "clearly erroneous" or "contrary to law," it should be affirmed.  *See* Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *Hughes v. Lasalle Bank, N.A.*, No. 02 Civ. 6384, 2004 WL 414828 at *1-2 (S.D.N.Y. Mar. 4, 2004) (Pollack, J.) (affirming Judge Pitman where plaintiffs "made no attempt" to show ruling was "clearly erroneous or contrary to law").[1]  For the reasons explained below, Aereo does not come close to meeting that standard.

Similarly, Aereo cites not a single case that holds a proper order would require the production of "documents related to harm and commercial impact from Aereo and similar technologies" on the theory that it is "comprehensive."  Aereo Objections at 2, 9 ("Obj."). The improper overbreadth of such an order is apparent on its face, and its burden is compounded by the further demand that Plaintiffs produce "*all* documents" sufficient to identify:

---

[1]   The "clearly erroneous" standard is met only if "the reviewing court on the entire evidence is left with the ***definite and firm conviction*** that a mistake has been committed."  *World Wrestling Fed. Entm't, Inc. v. William Morris Agency, Inc.*, 204 F.R.D. 263, 264 (S.D.N.Y. 2001) (Berman, J.) (affirming Pitman, M.J.) (emphasis added).  Similarly, an order is "contrary to law" only when it "fails to apply or misapplies relevant statutes, case law or rules of procedure."  *Id.*; *Catskill Dev., LLC v. Park Place Entm't Corp.*, 206 F.R.D. 78, 86 (S.D.N.Y. 2002).

- "harms and commercial impacts Aereo causes" that are distinct from "related" technologies such as antennas, DVRs, SlingBox or dongles; and

- for every television program broadcast by Plaintiffs "the specific and detailed financial impact on the profit for [each copyrighted] program resulting, specifically and only, from the Aereo technology."

Obj. at 1 (emphasis in original).

Aereo has no support for good reason:  As Judge Pitman recognized in rejecting Aereo's request, its objections are based on a misstatement of the governing substantive law of copyright, which sets the standard for relevance.[2]  In particular, Aereo incorrectly characterizes the market harm inquiry of the fourth fair use factor, which – as Judge Pitman noted on the record – does not support Aereo's demands.  Potenza Decl. Ex. 2 (3/21 Tr. 81:7-24).

Aereo also demands a forensic analysis, consisting of accounting-level details for each of the growing number of thousands of programs Aereo has infringed by retransmitting Plaintiffs' broadcast programs 24 hours a day, 7 days a week, even though Plaintiffs have elected only statutory damages.  That election, under the well-settled case law also cited on the record by Judge Pitman, makes such details irrelevant.  3/21 Tr. 32:15-33:10.

---

[2] Aereo asserts, without specific authority, that an order of the sweep that it seeks is "usually not . . . controversial," based on the proposition that a plaintiff is required to prove its damages at common law once liability has been determined.  Aereo confuses damages with the market harm test under the fourth fair use factor and, for that reason, its citation to cases relating to damages are inapposite. *See* Obj. at 1 n.2.

Worse still, to justify its sweeping objections, Aereo literally claims Plaintiffs have "avoid[ed] producing anything."  Obj. at 2.  That false statement should not be accepted at face value:

- As to market harm, Plaintiffs produced voluminous documents and information, including the documents described below, that both establish the markets adversely impacted by Aereo and Aereo-like services, and how Plaintiffs would be harmed if such services became widespread.  *See* pp. 6-8 *infra*;

- As to the irreparable nature of the harm Aereo causes, the Second Circuit, this Court and other courts have already concluded that discovery of the sort produced to date and that Judge Pitman ordered is sufficient for an adequate record to be built.  *See* pp. 10-16 *infra*.

- As to statutory damages, Plaintiffs have produced copyright registrations and the Court has found irreparable harm from Aereo's activities, which is more than sufficient to support (or contest) an award of statutory damages.  *See* pp. 8-10 *infra*.

Perhaps most significantly, Aereo also fails to advise the Court that Judge Pitman, aware of the scope of Plaintiffs' production, repeatedly asked Aereo to explain why the discovery already provided was and would not be enough.  Aereo had no answer.  3/21 Tr. 5:13-6:8.  Aereo also glosses over that Judge Pitman gave Aereo the specific opportunity to provide to him, *in camera*, the number of its current subscribers – on the theory that if the number were truly large enough, perhaps more detailed financial data from Plaintiffs possibly might be expected to yield meaningful information as to harm caused by Aereo. Aereo refused to do so.  Instead, it expressly agreed that it would let "Your Honor's decision" as to damages discovery "stand."  3/21 Tr. 91:15-95:4.  Nowhere does Aereo disclose this to the Court.

In short, Aereo's objections are based on the incorrect contention that case law supports its request – it does not – and a distortion of the record on which Judge Pitman ruled.  That is no basis on which to conclude Judge Pitman abused his discretion.  *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 78 (S.D.N.Y. 2012) ("highly deferential" review and reversal is appropriate only "if . . . discretion is abused").  The burden on the "party seeking to modify or set aside an order of a magistrate judge" is "heavy."  *See Pkfinans Int'l Corp v. IBJ Schrader Leasing Corp.*, Nos. 93 Civ. 5375 (SAS), 96 Civ. 1816 (SAS), 1996 WL 675772 at *1 (S.D.N.Y. Nov. 21, 1996).[3]  Aereo has not met it, and this Court should affirm the Order.[4]

## BACKGROUND

This Court referred all general pre-trial matters to Judge Pitman.  Dkt. 135.  Judge Pitman considered the arguments by the parties made in several discovery letters and held a 3-hour hearing on February 25, 2013.  Potenza Decl. Ex. 3.  Before issuing the Order, Judge Pitman ordered further briefing on the fair use/market harm factor and general damages discovery.  *Id.* Exs. 4 – 5.  After that, Judge Pitman held a second, 4-hour

---

[3]   Under that standard, Magistrate Judge Pitman's pre-trial rulings repeatedly have been affirmed by Judges of this Court.  *See, e.g., Bridgewater v. Taylor*, 745 F. Supp. 2d 355 (S.D.N.Y. 2010) (Marrero, J.); *Flaherty v. Filardi*, 388 F. Supp. 2d 274 (S.D.N.Y. 2005) (Swain, J.); *Hughes*, 2004 WL 414828 (Pollack, J.); *Sheikhan v. Lenox Hill Hosp.*, No. 98 Civ. 6468 (WHP), 1999 WL 386714 (S.D.N.Y. Jun. 11, 1999) (Pauley, J.); *Pkfinans*, 1996 WL 675772 (Scheindlin, J.).

[4]   The ABC Plaintiffs have asked Judge Pitman to reconsider his Order to the extent it requires production of *all* documents concerning the renegotiation of retransmission licenses that occurred after May 2011, as opposed to entering into an appropriate stipulation, as Judge Pitman himself proposed.  Aereo and the WNET Plaintiffs have submitted their own views on that proposal and the motion is pending.

4

hearing, this time focused exclusively on market harm and damages discovery issues. *See* 3/21 Tr. Aereo barely acknowledges this record.

The six "examples," Obj. at 5-10, Aereo offers in support of its objections actually illustrate why the Order is appropriate:

(1)  It denied the production of additional financial documents, Order at 2, ¶4; Obj. at 1, because Plaintiffs neither claim per program financial harm nor seek monetary recovery other than statutory damages. Moreover, Aereo waived its request for more financial info. *See* pp. 8-10, *infra*.

(2)  It denied Aereo's request for documents regarding "[h]ow consumers can and do use" purportedly "similar" technologies "like antennas," Order at 3, ¶7; Obj. at 7, because Judge Pitman recognized the relevance of such documents is "attenuated" and their production burdensome. 3/21 Tr. 124:18-21. *See* pp. 13-14 *infra*.

(3)  It excluded discovery on licensed Internet retransmission technologies, beyond the license agreements Plaintiffs have already agreed to produce pending an addendum to the Protective Order in this case, Order at 2, ¶3; Aereo Obj. at 5, because, by definition, a licensed service cannot harm Plaintiffs and is irrelevant to any market harm caused by Aereo or similar services. *See* pp. 14-16, *infra*.

(4)  It imposed time limits on Aereo's requests for documents relating to the renegotiation of retransmission agreements and research on in-home DVRs, unlicensed remote DVRs, unlicensed Internet retransmission and ad-skipping or fast-forwarding by in-home DVRs. Order at 1, ¶1; *id*. at 2, ¶3; *id*. at 3, ¶6; Obj. at 6-7. These limitations were based in part on Aereo's own suggestion and, if anything, generous to Aereo given the marginal relevance of these documents and the discovery already had of Plaintiffs. *See* pp. 16-18, *infra*.

(5)  It allows for the redaction of commercially sensitive terms in certain of Plaintiffs' license agreements. Order at 3, ¶8; Obj. at 9-10. In doing so, Judge Pitman established an orderly procedure that properly balanced the marginal relevance, if any, of such terms and the need for confidentiality. *See* pp. 18-19, *infra*.

(6)  By separate Order, Judge Pitman also set a discovery cut-off of June 14, 2013. Potenza Decl. Ex. 6 (4/1 Order); Obj. at 10. The schedule allows time for Plaintiffs to produce the documents Judge Pitman ordered well

before Aereo's depositions of Plaintiffs' witnesses (subject to the resolution of one outstanding issue, *see* n.4, *supra*).[5]  *See* p. 19, *infra.*

## DISCUSSION

### I.    Judge Pitman Properly Exercised His Discretion In Limiting Aereo's Overbroad and Vague Discovery Requests.

#### A.    The Contention That Plaintiffs Have Not Produced "Anything" (Obj. at 4) Is False.

Aereo begins with the demonstrably false statement that Plaintiffs have not "produced any documents, other than some copyright registration and television schedules." Obj. at 1.  In fact, Plaintiffs have produced tens of thousands of pages relating to damages and market harm[6] – far more than has been required in any similar case – including:

(1)    pre-litigation documents that concern Aereo (including Bamboom, Aereo's former name);

(2)    gross domestic broadcast television advertising revenue from 2011 and 2012, which is broken down by national and local advertising revenue;

(3)    all retransmission consent agreements for the New York City DMA in effect as of April 2012, and any amendments thereto or additional agreements entered since that time;

(4)    documents concerning negotiations of retransmission agreements or license agreements for online or mobile distribution of broadcast television

---

[5]    Should Judge Pitman deny the ABC Plaintiffs' motion for reconsideration, the June 14, 2013 deadline will not be sufficient time for the production of the voluminous documents related to the renegotiation of retransmission agreements that Judge Pitman has ordered be produced.

[6]    The details of the slight variations of the documents produced by the ABC Plaintiffs and WNET Plaintiffs is set forth in Exhibit A to the Shepard Declaration in Support of Plaintiffs' Memorandum of Law Pursuant to Magistrate Judge Pitman's February 26, 2013 Order.  Potenza Decl. Ex. 4, at Ex. A.

programs that reference Aereo, Filmon, Filmonx, Alki David, ivi, Aereokiller, BarryDriller, Zediva/Zedeva or Chet Kanojia;

(5)   Nielsen ratings for live and C+3 measurements of broadcast television viewing in 2011 and 2012;

(6)   comScore data on the viewership of broadcast television programs over the Internet or on mobile devices in 2011 and 2012;

(7)   market research from 2011 and 2012 concerning the impact of remote-storage DVRs, Slingbox, Aereo, as well as other unauthorized television retransmission services, such as ivi, Aereokiller, Zediva or Filmon, on Plaintiffs' domestic over-the-air retransmission, online or mobile markets for broadcast television programs;

(8)   documents from 2011 and 2012, regarding technology that Plaintiffs have developed and deployed to distribute broadcast television programming to mobile devices over the Internet;

(9)   documents concerning the adverse impact of Aereo on the potential market for Dyle;

(10)   Plaintiffs' communications with the government regarding Aereo or Bamboom; and

(11)   documents that establish the existence of and Plaintiffs' licensing into the video-on-demand ("VOD") market, specifically, domestic license agreements with iTunes, Hulu, Amazon and Netflix (subject to those third parties' redactions pursuant to the Order).[7]

Given this voluminous production, at the outset of the March 21 hearing, Judge Pitman put to Aereo a crucial question it never answered: "I guess the principal question I have for defendants is why is what plaintiffs have produced insufficient?  Why do you need more?"  3/21 Tr. 5:13-6:8.  Aereo was not able to answer Judge Pitman and its

---

[7]   The WNET Plaintiffs have also produced domestic license agreements with additional third parties, aggregated revenues derived from these licensing agreements on a quarterly basis, as well as some other additional documents.  *See* Potenza Decl. Ex. 4, at Ex. A.

objections before this Court shed no more light on why it needs more documents from Plaintiffs.

> **B.     Judge Pitman Correctly Denied Further Discovery into Program-Related and Other Financial Information.**

Under Aereo's view, a "comprehensive" order would compel production of, for each copyrighted television program broadcast by Plaintiffs, "detailed financial" information. *See* Obj. at 1.  Judge Pitman denied Aereo's requests for such information for three reasons.

First, Judge Pitman recognized that, under a fair use analysis, market harm need not be based on detailed financial information regarding the current effect of the infringing activity on the infringed works.  Here, Plaintiffs have acknowledged that the harm caused by Aereo to date is not quantifiable.  *See* 3/21 Tr. 9:12-18.  For that reason, the detailed financial information requested is of no relevance.  Accordingly, the analysis of harm will turn on whether there would be an adverse impact on the market for the copyrighted works should conduct like Aereo's become widespread.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); 3/21 Tr. 45:8-18.

For similar reasons, Aereo's assertion that, in order to respond to the "*unquantifiable* harm" it causes, it needs to show that (a) advertising sales have "*increased*," (b) Plaintiffs' programs have increased in value, and (c) how Plaintiffs revise "*future* financial projections," (something it did not seek before Judge Pitman) has no support in any copyright case.  Obj. at 8-9 (emphases in original).  These arguments make no sense.  The type of market harm to which *Campbell* refers has nothing to do with **quantifiable** data, it is based on the inevitable erosion of existing or potential markets that

occurs when copyright exclusivity is lost.  In short, Aereo seeks to hold Plaintiffs to a harm threshold they do not argue and need not meet.

Second, Judge Pitman correctly recognized that detailed financial documents have extremely limited relevance where a copyright plaintiff has elected to recover statutory damages instead of actual damages based on lost revenues or profits.  *See* Potenza Decl. Ex. 4 (3/19 Brief at 12-14); 3/21 Tr. 32:15-33:10.[8]  Detailed accounting-level damages discovery of the type Aereo seeks is routinely rejected by judges of this Court in cases where copyright owners elect to recover statutory damages.  *See Capitol Records, Inc. v. MP3Tunes, LLC*, No. 07-cv-9931 WHP-FM (S.D.N.Y. April 12, 2010), ECF No. 168, at 2-3 (affirming denial of profit discovery where statutory damages had been elected and defendants had failed to articulate how it would screen the plethora of factors impacting profitability to determine defendant's impact); *Arista Records LLC v. Lime Group LLC*, 06 CV 5936 KMW, 2011 WL 1486640, at *2-3 (S.D.N.Y. Apr. 11, 2011) ("Had Plaintiffs been pursuing actual damages rather than statutory damages for their post-1972 sound recordings, Defendants likely would have been entitled to greater profits and cost-based discovery."); *see also id.* at *2 n.2 (noting defendants were "denied royalty, profit and cost information").

---

[8]   Aereo incorrectly suggests that Plaintiffs have not agreed to provide and have not provided "documents which concern the damages that [Plaintiffs] allege they have suffered as a result of [Aereo's] alleged conduct."  *See* Obj. at 1 n.2 (quoting *Briese Lichttechnick Vertriebs GmbH v. Langton*, 272 F.R.D. 369, 374 (S.D.N.Y. 2011)).  That is not true.  *See* Potenza Decl. Ex. 7 (Jan.15, 2013 Ltr. from Keller to Elkin); Hosp Decl. Ex. 8 at 2 (Dkt. 180).

Third, Judge Pitman also understood that, to the extent damages discovery remains relevant in a statutory damages case, "a multitude of factors" affect " profitability." *See* 3/21 Tr. 32:14-33:10; 89:24-90:3.[9]  Nonetheless, he offered Aereo the specific opportunity to build the record that it was entitled to such documents.  He acknowledged the theory that had Aereo's service become commercially significant, it might have caused quantifiable financial harm and, in such case, that some of those "multitude of factors" that impact a particular work's profitability might take on less weight.  He therefore directly and repeatedly asked Aereo if its subscriber base was large enough to have had such an impact.  3/21 Tr. 90:20-94:8.

Aereo not only refused to disclose how many subscribers it has, even *in camera*, but also it stated it would rather abandon its request for more detailed financial data than do so.  *Id.* at 90:20-95:2.  Aereo also stated, that it would "come back to" Judge Pitman with its subscriber data, "if necessary." *Id*.  It never did so, and any argument regarding its need for that data now is waived.

### C.    Judge Pitman's Refusal to Grant Wide-Ranging Discovery Relating to Similar Technologies, "Like Antennas," Or Transmission Services, Whether Licensed Or Not, Was Appropriate.

In addition to seeking detailed, per program financial documents to assist it in proving that Aereo has had no financial impact, Aereo also seeks all documents in the possession of Plaintiffs related to the consumer use of "similar technologies," like

---

[9]    For this reason, Judge Pitman also was correct to reject further discovery based on whether Plaintiffs' revenues have "*improved*" since the launch of Aereo, Obj. at 8 n.22, because any such general "improvement" in Plaintiffs' financial results would demonstrate nothing relevant to the harm caused by Aereo.

antennas, or transmission services, whether such technologies are licensed or, like Aereo, are unlicensed.  Aereo claims it is entitled to defend its conduct by pointing out how little additional harm it causes, as compared to other technologies, whether licensed or not.  Obj. at 1, 5.  Judge Pitman denied Aereo's request for several reasons.

### 1. Under the Relevant Standard, Correctly Applied by Judge Pitman, Aereo Has All The Discovery It Needs.

Judge Pitman began with the correct standard for assessing market harm under the fourth fair-use factor.  The relevant question is whether the spread of Aereo and other similar unauthorized Internet television retransmission services like Aereo – such as FilmOn, ivi and Aereokiller – would result in harm to one or more of the actual or potential markets for Plaintiffs' broadcast programming.  *See Campbell*, 510 U.S. at 590; 3/21 Tr. 45:8-18; 67:22-68:2.  The analysis looks to two inter-related issues:  (1) the existence of actual or potential markets for Plaintiffs' copyrighted programs and (2) the actual or potential harm Aereo and like services would cause to those markets.  As Judge Pitman correctly concluded, that is not a comparative analysis.  *See* 3/21 Tr. 67:22-68:2 ("[T]he Supreme Court tells us that 'the fourth  factor requires an inquiry into whether unrestricted and widespread conduct of the sort engaged in by the defendant" itself, not in comparison to others,  "would result in a substantially adverse impact on the potential market for the original.'"); *see also* 81:7-24 ("[I]f you include licensed or permitted uses within . . . conduct of the sort engaged in by the defendant, you wouldn't even get to the question of fair use because the conduct would be licensed.").

Plaintiffs already provided ample evidence of those actual or potential markets in the form of retransmission agreements, agreements with partners such as Netflix, Amazon,

Hulu and Apple, and Nielsen, as well as the evidence produced in the preliminary

injunction phase.  *See Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 397-400

(S.D.N.Y. 2012) (Aereo will irreparably harm, among other things, Plaintiffs' markets for

retransmission and advertising fees).  These markets include the cable and satellite

retransmission market as well as markets for licensing programs for live or subsequent

viewing via the Internet or on mobile devices.  *See* Potenza Decl. Ex. 4 (Pls.' 3/19 Br. at 6-

7).  Plaintiffs have produced their retransmission consent agreements for New York City,

and have agreed to produce Internet license agreements with Amazon, Apple, Hulu and

Netflix, as soon as Aereo agrees to an addendum to the protective order.

There is no dispute about the existence of such markets.  Aereo is spending

millions of dollars to enter them.  There is also no dispute under well-settled law that

unauthorized uses of copyrighted works will adversely affect those markets – in ways that

are not just harmful, but irreparably so.  *See Aereo, Inc.*, 874 F. Supp. 2d at 397-400;

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (finding irreparable harm where

"ivi's live retransmissions . . . would substantially diminish the value of" plaintiffs'

copyright works and "that damage would be difficult to measure and monetary damages

would be insufficient to remedy the harms"); *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir.

2010) ("Harm might be irremediable, or irreparable, for many reasons, including that a loss

is difficult to replace or difficult to measure[.]"); *Warner Bros. Entm't, Inc. v. RDR Books*,

575 F. Supp. 2d 513, 550-53 (S.D.N.Y. 2008) (evidence of irreparable harm used to find

market harm); *Fox Television Stations v. Barry Driller Content Sys., PLC*, No. CV 12-

6921, 2012 WL 6784498, at *6 (C.D. Cal. Dec. 27, 2012) (finding irreparable harm

because defendant's "service threatens Plaintiffs' ability to negotiate favorable retransmission consent agreements" and "competes with Plaintiffs' ability to develop their own internet distribution channels"); *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011) (finding irreparable harm where "Defendants interfere with Plaintiffs' grant of exclusivity to their licensees, Plaintiffs' ability to negotiate similar agreements in the future . . . and Plaintiffs' overall ability to control the use and transmission of their Copyrighted Works").

Based on this, Judge Pitman recognized that the discovery he was granting went as far as "the broadest [extent to which] the fourth factor of fair use can be read." 3/21 Tr. at 81:7-11. He properly rejected the boundless discovery Aereo sought to compel in light of its marginal relevance and the burden of production. 3/21 Tr. 9:12-10:23; 32:15-33:5. There is nothing erroneous about that. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

## 2.   Production of Antenna-Related Documents Is Irrelevant And Would Be Overwhelmingly Burdensome.

According to Aereo, discovery relating to consumer use of antennas supports an unclean hands defense because Plaintiffs "discourage[] over-the-air broadcasts, vis-à-vis cable" in order to boost retransmission fees. 3/21 Tr. 121:16-21. Judge Pitman properly rejected that demand. Unclean hands, as a matter of law, must relate to the specific transaction at issue and, even assuming Aereo's wild speculations were correct, that shows Plaintiffs are trying to "maximiz[e] profits" generally, nothing more. 3/21 Tr. 122:17-123:3; *see Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999) ("[T]he defense of unclean hands applies only with respect to the right in suit[.]"

(quoting *Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 324 (2d Cir. 1983))).  Profit maximization is not unclean hands.  *See also* Obj. at 7-8.

The very assertion of such a bizarre argument exposes the invalidity of Aereo's objections.  Aereo has refined its argument to contend, whether because of unclean hands or otherwise, Plaintiffs seek "to prevent consumer use of antennas generally."  Obj. at 7-8. Putting aside that the over-the-air broadcast business was built on the millions of viewers who use antennas, how those viewers receive Plaintiffs' broadcasts says nothing about whether *Aereo's commercial retransmission* of those broadcasts causes market harm.

In addition to the antenna-related documents being wholly irrelevant, the burden of searching for and having to produce documents relating to the term "antenna" cannot be overstated.  Plaintiffs are in the business of over-the-air broadcasting to consumers, many of whom receive such programs directly through their own antennas.  They will have a very large number of documents relating to antennas.  Given Aereo's assertion to this Court that it is entitled to "Plaintiffs' view to consumer use of antennas generally," its request is essentially boundless.  Judge Pitman did not clearly err in denying such discovery.

### 3.   Discovery Into Licensed Technologies Is Irrelevant to Quantifying Harm Because They Can Cause No Harm Relevant to Fair Use.

As for Aereo's request for documents concerning the harm caused by *licensed* technologies, that is, literally, a nonsensical request.  By definition, a licensed technology or retransmission service cannot harm the licensor.  Even if Aereo's request is confined to discovery relating to consumer research regarding licensed technologies, Judge Pitman was right to reject it.  Aereo appears to believe that its service is licensed (in the sense that once

14

a program is broadcast over the air, Aereo is free to copy and retransmit it) and, therefore, that research into the harm Aereo causes compared to other licensed service providers, is relevant.  This is wrong in two respects.

First, Aereo is in no sense licensed.  Plaintiffs do have a broadcast license issued by the Federal Communications Commission under the Communications Act to use spectrum to broadcast their programs to the public at large, but that does not mean that they are "licensing" consumers (or anyone else) to use antenna technology, Obj. at 5 n.17, or that Aereo is authorized or licensed to retransmit Plaintiffs' copyrighted programs under the Copyright Act.  *See also* Potenza Decl. Ex. 8 (Aereo Resp. To WNET Pls. Supp. Req. For Admissions 27 (admitting Aereo has no "written or oral agreements" with broadcasters)); *Id.* Ex. 3 (2/25 Tr. 69:6-70:12).

Second, research on the effect on Plaintiffs of licensed Internet retransmission technologies – not Aereo – is irrelevant to the harm caused by Aereo and similar Internet transmission services.  *Campbell* says as much.  Consistent with applicable law, Judge Pitman limited discovery to unlicensed Internet technologies – i.e., those most similar to Aereo – because "[t]he issue under fair use is whether an ***unauthorized, unlicensed use or a use that's not permitted by the copyright holder constitutes fair use.***  If you . . . include licensed or permitted uses within that, you're necessarily talking about something that's not of the sort . . . engaged in by the defendant."  3/21 Tr. 81:12-24 (emphasis added).  That was correct.

As noted, the documents Plaintiffs already have produced regarding licensed services are relevant to demonstrate actual or potential markets for their broadcast

programs. These include NBC Universal's presentation entitled "The Billion Dollar Research Lab," Potenza Decl. Ex. 9 (DNC0043339-DNC0043439), which focused on streaming the Olympics *in addition to* viewing them through other authorized distribution channels, not, as Aereo advertises, through completely unauthorized means. *See, e.g., id.* at DNC0043394 (discussing "[s]imultaneous viewing" of Olympics on TV and over the Internet). The research studied viewing habits during the unique circumstances of the Summer Olympics, including the impact of providing streaming access to every Olympic event, most of which were never shown on broadcast TV. *See id.* at DNC0043409. Moreover, for all of the pointed arguments Aereo makes relating to "The Billion Dollar Research Lab," it never acknowledges that, despite its marginal relevance, if any, it was not hidden, Obj. at 4 n.15, but voluntarily produced long before Judge Pitman's ruling.

Finally, Aereo's objections that it needs discovery into licensed technologies in connection with the fourth fair use factor is completely contrary to what it told Judge Pitman. Judge Pitman asked Aereo whether "something like Netflix would [] be something that should be considered under the fourth fair use factor." Aereo said "[t]he answer is no[.]" 3/21 Tr. 70:6-25. Having told Judge Pitman it was not pressing for discovery into "something like Netflix" – a "licensed" technology – Aereo should not be heard to object to an Order that reflects the exact position it took.

**D.    The Time Frames For Production Of Documents Are More Than Generous And Not Clearly Erroneous.**

Judge Pitman set May 2011 to the present as the relevant dates for retransmission consent negotiations and January 2010 to the present for documents relating to in-home

DVRs, unlicensed remote DVRs, unlicensed transmission technologies and ad-skipping or fast-forwarding by in-home DVRs.  Aereo takes issue with both periods.

If anything, however, looking back to May 2011 for documents relating to the renegotiations of retransmission consent agreements is far too generous to Aereo.  Judge Pitman accepted that May 2011 is when Aereo had not even launched, but instead was in "pre-beta" mode.  Potenza Decl. Ex. 10 (5/30/12 Tr. 55:17-56:7 (Franks Redirect)).  There is no reason to expect that Aereo, at such a nascent stage, possibly could have had any measurable effect at all on Plaintiffs' renegotiation of retransmission agreements with cable and satellite providers (against whom Aereo directly competes).

Furthermore, Aereo itself *agreed* before Judge Pitman that the only relevant retransmission agreements were those renegotiated after Aereo made its initial announcement in May 2011.  *See* 3/21 Tr. 14:4-22 ("THE COURT:  So we agree then, so we agree with retransmission we're limited to agreements, the only agreements that would be relevant would be agreements that were renegotiated after Aereo launched, agreed?  MR. HOSP:  Well, any agreements that were renegotiated after Aereo announced. . . .")).  Aereo has articulated no reason for going even further back in time.

Aereo now also claims to need Plaintiffs' research on in-home DVRs, remote DVRs and unlicensed Internet transmission technologies, as well as research relating to ad-skipping and fast forwarding, dating back to January 2005.  Obj. at 7.  When Judge Pitman set January 2010 as the cutoff, Aereo kept silent, never explaining why over three years of research would somehow be insufficient.  *See* 3/21 Tr. 82:16-23, 109:4-6.  Before this Court, Aereo claims that it needs Plaintiffs to search for research dating back *eight* years

on the theory that the *Cablevision* case is some sort of meaningful marker as a start date. Obj. at 7.  The scope of Aereo's request, however, encompasses in-home DVRs, ad-skipping technologies and Internet retransmission technologies.  None of those were even at issue in the *Cablevision* case.  The filing of that complaint as a benchmark for discovery is clearly incorrect and is not in any way explained by Aereo.

It is entirely proper for a court to impose time limitations on overly broad discovery requests.  *See Moore v. Publicis Groupe SA*, No. 11-cv-1279, 2012 WL 517207 (S.D.N.Y. Feb. 14, 2012) (magistrate judge properly limited "the temporal scope of discovery"); *In re Heparin Prods. Liab. Litig.*, 273 F.R.D. 399, 409-10 (N.D. Ohio 2011) (overly broad document requests for financial information limited to two years).

### E.   Permitting Redactions To Third-Party License Agreements Was Not Clearly Erroneous.

Aereo also objects to the Order allowing third parties, such as Hulu, Netflix, Amazon and Apple, to make redactions to their license agreements with Plaintiffs.  Obj. at 9-10.  Aereo now asserts that information that Judge Pitman has allowed to be redacted is "most relevant," because it includes "material and financial terms" that would "show or not show an impact on the market."

There are two flaws with Aereo's argument.  First, Aereo ignores that the Order established a process by which the third parties could make redactions, as they deemed necessary, to their license agreements, and then "if defendants want to come back and challenge the redactions, you're free to do so."  3/21 Tr. 170:5-7.  Judge Pitman has not put his imprimatur on any particular redactions as he has not yet reviewed any of the redactions.  If Aereo is at some future point able to explain why it needs to see certain

information that was redacted, it can raise the issue with Judge Pitman.  Aereo's present objection does not present any reason why this process is insufficient.

Second, on the merits, Aereo has not explained how the details of any particular financial arrangement proves anything with respect to the harm caused by Aereo. Plaintiffs have produced more than sufficient information to establish the existence of this market.  The exact financial or other terms of Plaintiffs' agreements with their licensees are irrelevant to the issues in this case:  whether Plaintiffs license into Internet-based markets (the documents show they do); whether the unlicensed businesses of Aereo and others would impair those markets (they will); and whether Aereo causes irreparable harm (this Court has found that it does and will).  Absent Aereo's explanation as to the relevance of this information, its objection to the authorization of limited redactions should be overruled.

**F.      Judge Pitman Did Not Err In Setting A Discovery Schedule.**

As explained above, Plaintiffs have provided Aereo with voluminous document discovery to date.  Aereo has had much of this information for more than a year due to the very extensive document and deposition discovery during the preliminary injunction phase. Plaintiffs also have been producing the documents that Judge Pitman ordered be produced on March 29, 2013.   Aereo will have the documents that it needs to depose Plaintiffs. Assuming Judge Pitman grants Plaintiffs' motion for reconsideration, the discovery schedule he set is workable.[10]

---

[10]     Aereo's complaint that Plaintiffs have not stated a date by which they will complete the "limited production" ordered by Judge Pitman is incomplete, because it leaves out that Judge Pitman's ruling on the pending stipulation proposal obviously will affect

Finally, Plaintiffs also note that, contrary to Aereo's assertion, Obj. at 2 n.6, Judge Pitman's scheduling order specifically provides a schedule for the disclosure of expert reports pursuant to Rule 26(a)(2) and expert depositions.  Aereo has provided no specific, factual reason why Judge Pitman's rulings should be overturned on this point.

## CONCLUSION

For the foregoing reasons, Aereo's objections should be overruled.

Respectfully submitted,

/s/ Bruce P. Keller
Bruce P. Keller
Jeffrey P. Cunard
Michael R. Potenza
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel.:    (212) 909-6000
Fax:    (212) 909-6836

*Counsel for the ABC Plaintiffs*

Dated:  April 23, 2013

---

production dates.  It also leaves out that Aereo stated on April 3, 2013 that, regardless of what Plaintiffs produce pursuant to the Order, it likely would insist on the production of still more documents.

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2013, the foregoing Plaintiffs' Response To Aereo, Inc.'s Objections To Magistrate Judge Pitman's Rulings On Discovery Disputes was filed electronically with the Clerk of Court through the CM/ECF system and will be sent electronically to the Filing Users listed on the Clerk's Notice of Electronic Filing (NEF), and paper copies, via first class mail, will be sent on April 23, 2013 to those non Filing Users who will not be served electronically.

/s/ Michael R. Potenza
Michael R. Potenza

# EXHIBIT 3

C5V8ABC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

AMERICAN BROADCASTING COMPANIES,
INC., et al.,

                    Plaintiffs,

            v.                          12 Cv. 1540 (AJN)

AEREO, INC.,

                    Defendant.

------------------------------x

WNET, et al.,
            Plaintiffs,

            v.                          12 Cv. 1543 (AJN)

AEREO, INC.,

                    Defendant.

------------------------------x

                                        May 31, 2012
                                        9:15 a.m.

Before:

                    HON. ALISON J. NATHAN

                                        District Judge

C5V8ABC1

1                              APPEARANCES

2    DEBEVOISE & PLIMPTON LLP
          Attorneys for ABC Plaintiffs
3    BY:  BRUCE P. KELLER
          MICHAEL R. POTENZA
4         JEFFREY P. CUNARD
          JENNIFER INSLEY-PRUITT
5         MATTHEW B. HARRIS

6    JENNER & BLOCK
          Attorneys for WNET Plaintiffs
7    BY:  STEVEN B. FABRIZIO
          SCOTT B. WILKENS
8         KENNETH D. KLEIN
          MARINA K. JENKINS
9
     GOODWIN PROCTER LLP
10        Attorneys for Defendant
     BY:  JOHN ENGLANDER
11        R. DAVID HOSP
          MARK S. PUZELLA
12
     WINSTON & STRAWN
13        Attorneys for Defendant
     BY:  MICHAEL S. ELKIN
14        THOMAS P. LANE

15   CONSTANTINE CANNON LLP
          Attorneys for Defendant
16   BY:  SETH D. GREENSTEIN

17

18

19

20

21

22

23

24

25

C5V8ABC3                    Brennan - direct

1    have it on live note at this point.

2              THE COURT:  Why don't you ask your question again,

3    Mr. Klein.  A short leash.  I will allow in what is

4    appropriately rebuttal testimony and whatever comes in I am

5    only going to take in what is appropriately rebuttal for my

6    evidentiary purposes.  I don't want to retry cumulative points

7    being made that you have made previously.  So short window

8    here.  Ask your question, bearing in mind that I am only going

9    to let in what is appropriately rebuttal.

10   Q.  Very briefly, approximately how many retransmission

11   agreements does Fox have?

12   A.  A few hundred.

13   Q.  Are any of those retransmission agreements being negotiated

14   today at this very time?

15   A.  Yes.

16   Q.  At any given time, are there retransmission agreements

17   being negotiated and renegotiated?

18             MR. ELKIN:  Objection, your Honor.  Lack of foundation

19   and beyond the scope.  He hasn't established this witness's

20   knowledge with respect to whether or not she has frontline

21   responsibility for these agreements or otherwise.  Aside from

22   the fact that it's beyond the scope.

23             MR. KLEIN:  I am happy to ask the foundation question

24   if your Honor would like.  I thought she gave the answer when

25   she explained what her department does and what she does, but I

C5V8ABC3                    Brennan - direct

1    will ask it again if the Court would want me to.

2              THE COURT:  Mr. Klein, you're supplementing a bit here

3    and you're going beyond the scope.  So I sustain it.

4              MR. KLEIN:  Thank you, your Honor.

5              I have no further questions.

6    CROSS-EXAMINATION

7    BY MR. ELKIN:

8    Q.  Nice to see you again, Ms. Brennan.

9    A.  You too.

10   Q.  We met each other, I think it was last month, April 25?

11   A.  Yes.

12   Q.  I took your deposition, do you remember that, in Los

13   Angeles?

14   A.  I remember.

15   Q.  A few questions for you to follow up on Mr. Klein's direct

16   examination.

17             First, with respect to harms that you identified to

18   Fox with the advent of Aereo, those harms that you testified

19   to, they existed, did they not, in the spring of 2011 when you

20   first heard about Aereo, isn't that correct?

21   A.  Well, the harms could only occur after the service went

22   live.  So the service wasn't live in the spring of 2011.

23   Q.  You don't remember telling me that the harms that you

24   identified in the deposition, that you have testified to here

25   today, existed as of the time that you learned that Aereo was