## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-00832-PAB-KLM
Associated with Southern District of New York Civil Action No. 12 Civ. 1540 (AJN)
(consolidated)


DISH NETWORK L.L.C.,

        *Non-Party Movant*,

v.

WNET,
THIRTEEN,
FOX TELEVISION STATIONS, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
WPIX, INC.,
UNIVISION TELEVISION GROUP, INC.,
THE UNIVISION NETWORK LIMITED PARTNERSHIP, and
PUBLIC BROADCASTING SERVICE,

        *Respondents*.

---

## DECLARATION OF ELYSE D. ECHTMAN IN SUPPORT OF DISH NETWORK L.L.C.'S UNOPPOSED MOTION TO REDACT CONFIDENTIAL INFORMATION

---

I, Elyse D. Echtman, declare:

    1.    I am a partner with the law firm of Orrick, Herrington & Sutcliffe LLP, attorneys for DISH Network L.L.C. ("DISH"). Except where otherwise noted, I have personal knowledge of the facts stated in this declaration.

    2.    I submit this declaration in support of Non-Party Movant DISH Network L.L.C.'s Unopposed Motion to Redact Confidential Information from the Transcript of the Motion Hearing Held on May 31, 2013.

3.      In accordance with D.C. Colorado Local Civil Rule 7.1. A., I met and conferred with counsel for Respondents in an effort to resolve this matter.  On June 24, 2012, I sent Julie Shepard at Jenner & Block LLP, counsel of record for Respondents, an email explaining that DISH intended to move to redact confidential information from the transcript of the motion hearing held on May 31, 2013.  In the email, I informed Ms. Shepard of DISH's position that the transcript should be redacted to preserve the confidentiality of highly confidential documents produced in the underlying action by Aereo, Inc., which Respondents previously filed under restricted access in this action.  I also provided Ms. Shepard with a copy of the transcript indicating the proposed redactions.

4.      Ms. Shepard responded to my email with confirmation that Respondents do not oppose the proposed redactions.

5.      Attached hereto as Exhibit 1 is a copy of the proposed redacted transcript.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th of June, 2013, at New York, New York

_____
        Elyse D. Echtman

## CERTIFICATE OF SERVICE

I hereby certify that on this June 25, 2013, a true and correct copy of the foregoing DECLARATION OF ELYSE D. ECHTMAN IN SUPPORT OF DISH NETWORK L.L.C.'S UNOPPOSED MOTION TO REDACT CONFIDENTIAL INFORMATION was filed with the Court and served via ECF on:

> Sean Robert Gallagher
> Polsinelli PC-Denver
> 1515 Wynkoop #600
> Denver, CO 80202-1130
> Telephone: 720-931-1163
> Email: sgallagher@polsinelli.com

> *Attorneys for Respondents*

And served via electronic mail and United Parcel Service on:

> Avery Woods Reporting Services, Inc.
> Attn: Ellen E. Miller
> 455 Shearman Street
> Suite 250
> Denver, CO 80203
> Telephone: 303-825-6119
> Email: info@averywoods.net

Jason M. Bernstein
Managing Clerk
Orrick Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
Telephone: 212-506-5388
Email: jbernstein@orrick.com

# EXHIBIT 1

MOTIONS HEARING - MAY 30, 2013

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 13-CV-00832-PAB-KLM


DISH NETWORK, LLC,

   Non-Party Movant,

vs.

WNET, et al,

   Respondents.



     Proceedings before KRISTEN L. MIX, United States
Magistrate Judge, United States District Court for the
District of Colorado, commencing at 10:01 a.m., Friday,
May 31, 2013, in the United States Courthouse, Denver,
Colorado.


     WHEREUPON, THE ELECTRONICALLY RECORDED
PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...


APPEARANCES

MS. ELYSE D. ECHTMAN, ESQ.
Appearing on behalf of the Non-party Movant.

MR. SEAN R. GALLAGHER, ESQ., MS. JULIE A. SHEPARD, ESQ.
Appearing on behalf of the Respondents.



MOTIONS HEARING

MOTIONS HEARING - MAY 30, 2013

```
 1                    P R O C E E D I N G S
 2              (Whereupon, within the electronically recorded
 3    proceedings are herein transcribed, pursuant to order of
 4    counsel.)
 5              THE COURT:  Good morning.
 6              MR. GALLAGHER:  Good morning.
 7              THE COURT:  This is Case No. 12 -- excuse me
 8    -- 13-CV-00832, Dish Network, LLC versus WNET, et al.
 9    Let's have counsel enter appearances, please.
10              MS. ECHTMAN:  Good morning, Your Honor.  My
11    name is Elyse Echtman of Orrick, Herrington & Sutcliffe.
12    I represent non-movement -- sorry, non-party movant Dish
13    Network, LLC.
14              THE COURT:  Good morning.
15              MR. GALLAGHER:  Good morning, Your Honor.
16    Sean Gallagher from Pulsinelli, PC on behalf of the
17    respondents.  Also with me at counsel table is Julie
18    Shepard from Jenner and Block.
19              THE COURT:  Good morning.
20              MS. SHEPARD:  Good morning.
21              THE COURT:  We're here on the non-party Dish
22    Network's motion to quash subpoena.  Counsel, for
23    purposes of efficiency I want to assure you that I have
24    reviewed the motion to quash and its exhibits,
25    respondent's opposition to the motion to quash and it's
```

MOTIONS HEARING - MAY 30, 2013

Page 3

1    exhibits, and the reply in support of the motion to

2    quash and its exhibits.  I have also reviewed the

3    opinion of Judge Nathan in -- excuse me, in American

4    Broadcasting Company's, Inc. versus Aerio, Inc. reported

5    at 874 F.Supp. 2d, 373 and the Second Circuit decision

6    in WNET, et al versus Aerio, Inc. reported at 712 F.3rd

7    676.  With that background I'll hear from the non-party

8    movant first.  Ms. Echtman.

9            MS. ECHTMAN:  Thank you, Your Honor.  I'll

10   just jump right in to the reasons why this discovery is

11   unnecessary and burdensome.

12           First, the respondents asked Dish to produce

13   documents that are available from the party to its

14   litigation, Aerio.  They asked for any draft or final

15   agreements or memorandum of understanding between Dish

16   and Aerio on different subject matter.  All of that

17   discovery can be had from Aerio.  Indeed, they said they

18   have taken discovery from Aerio, but the discovery was

19   scant.  They provided no basis to suspect that Aerio

20   didn't produce everything it had and, indeed, there are

21   multiple decisions from this district court holding that

22   when discovery may be had from a party to the litigation

23   those efforts must be fully exhausted and you cannot

24   obtain duplicative discovery from a non-party.  It's

25   presumed to be burdensome and unnecessary and for that

MOTIONS HEARING - MAY 30, 2013

1    reason those portions of the subpoena should be quashed.

2            Second, the remainder of the materials that

3    the respondents seek from Dish are highly confidential

4    internal analyses and documents.  When -- when

5    confidential materials are requested, the -- the

6    subpoenaing party has a duty to show that they are both

7    relevant and necessary to the litigation.  Not only

8    that, when the documents are sought from a competitor,

9    and Fox asserts that Aerio and Dish are indeed

10   competitors, and the documents have the potential to put

11   the non party at a competitive disadvantage, a

12   substantial need must be shown.  The existence of a

13   protective order is not sufficient.  There's a

14   presumption of harm, and it must be something that is

15   substantial and necessary -- substantially necessary to

16   the litigation.  That showing has not been made here.

17           And the types of documents sought, to the

18   extent they might exist, are sensitive for several

19   reasons.  Fox wants any internal valuations and analyses

20   that Dish may have done of Aerio.  Now, in this action

21   those -- those documents would be required to be

22   produced to Aerio which is a litigant here.  Fox also

23   claims that Dish is in negotiations with Aerio.  To the

24   extent that might be so it would be harmful to Dish to

25   produce its internal -- its internal versions and

MOTIONS HEARING - MAY 30, 2013

1    valuations relevant to any such negotiations to the

2    party to which it might be sitting across the table.

3           At the same time, Fox says, well, it wants

4    Dish's internal analyses and valuations about how the

5    very existence of Aerio might assist Dish in its

6    retransmission consent negotiations with the network

7    such as Fox and the other respondents in the case.

8           Again, that would harm Dish because Dish at

9    some point will be sitting across the table from Fox in

10   connection with retransmission consent negotiations.

11   Dish and Fox are currently parties to a retransmission

12   consent agreement and Fox wants a sneak peek into what

13   Dish's plans might be and its future negotiations with

14   it and other networks.  Again, that's something that

15   Dish should not be compelled to produce to Fox.

16          In addition, none of this is necessary to the

17   case.  This all goes to the issue of irreparable harm as

18   Fox concedes.  The district court in New York has

19   already found that Fox made a sufficient showing.  They

20   say Aerio is still contesting it.  Well, if Fox needs

21   more evidence on how Aerio might harm it in connection

22   with retransmission consent negotiations it's in the

23   best position to have that.

24          The declaration of Sherry Brennen shows that.

25   Ms. Brennan, a Fox executive, says that Dish regularly

MOTIONS HEARING - MAY 30, 2013

1    engages -- I mean, Fox regularly engages in

2    retransmission consent negotiations with paid TV

3    providers such as Dish.  To the extent that it's already

4    sat across the table and a party has raised Aerio as an

5    issue and said I'm going to pay you less because Aerio

6    is out there, and Aerio is not paying retransmission

7    consent fees.  Well, that's the best evidence.

8            What Dish's plans might be with respect to

9    negotiations that may happen in the future and whether

10   those negotiation positions may be successful or not is

11   all very speculative.  It's a fishing expedition.

12   They've got no reason to believe that those plans have

13   been made.  And if they have, they shouldn't be able to

14   get them in connection with the litigation.

15           THE COURT:  Let me ask you --

16           MS. ECHTMAN:  Because Fox knows what people

17   have said when they've sat across the table from Fox,

18   and that's Fox's best evidence.  And the district judge

19   already agreed with Fox and said, you have what you need

20   on this topic.

21           THE COURT:  Well, let me ask you, Ms. Echtman,

22   two questions.  The first relates to the category of

23   documents that they're requesting and the subpoena that

24   relates to drafts or final agreements or memorandums of

25   understanding between Aerio and Dish or EchoStar.  Is it

MOTIONS HEARING - MAY 30, 2013

1   your contention that those documents are also

2   confidential if they exist?

3           MS. ECHTMAN:  If they exist in Dish's files

4   and they haven't been shared with Aerio, yes, they're

5   confidential, and it would put Dish at a competitive

6   disadvantage to share them.  Anything that's in Aerio's

7   possession they already have and they can get directly

8   from Aerio which is a party to their litigation.  To the

9   extent there might be something that was not shared with

10  Aerio in Dish's possession that would be harm a to Dish.

11          THE COURT:  Let me ask you this.  Is there any

12  argument made by Fox, as you understand it, that the

13  documents requested go not to the issue of irreparable

14  harm, but to the issue of damages that they've requested

15  in their complaint in the Southern District of New York?

16          MS. ECHTMAN:  Well, if they're on the issue of

17  damages they would have to be present damages.  And Dish

18  and Fox have a -- have a retransmission consent

19  agreement that's been in effect for years.  So, what

20  might happen in the future wouldn't be relevant to

21  actual damages.  And in terms of how their negotiating

22  position might be affected by the existence of Aerio,

23  they're engaged in these types of negotiations all the

24  time.  And if Aerio's been raised, it's been raised, and

25  they can talk to actual negotiations and whether they

Page 8

1    ended up receiving less in retransmission consent fees

2    because of the existence of Aerio as opposed to what

3    might possibly happen in future negotiations.

4              THE COURT:  What if there is in the records of

5    Dish an agreement between Dish and Aerio, but that

6    doesn't take effect until January 1st, 2014?  Couldn't

7    that arguably go to the issue of damages in the case in

8    New York?

9              MS. ECHTMAN:  But if there's a final agreement

10   between Dish and Aerio that might go into effect in the

11   future they could get that agreement from Aerio.  And,

12   indeed, they could ask Aerio in any deposition about any

13   future plans with Dish.  They don't need to ask those

14   questions of Dish, and they don't need to get any

15   internal documents from Dish.

16             THE COURT:  Thank you.

17             MS. ECHTMAN:  Thank you.

18             THE COURT:  Mr. Gallagher.

19             MR. GALLAGHER:  Good morning, Your Honor.

20             THE COURT:  Good morning.

21             MR. GALLAGHER:  Counsel really directed her

22   discussion this morning at -- at Fox.  And quite frankly

23   I think those of us who have followed this litigation

24   often think of EchoStar versus Fox or Dish versus Fox

25   because there has been litigation between those two

MOTIONS HEARING - MAY 30, 2013

1  parties.  But it's also important to note that the

2  respondents in this case are not just -- it's not just

3  Fox.  PBS is also one of their respondents that's

4  seeking this information.  So while counsel has

5  attempted to focus a discussion on a dispute between Fox

6  and Dish, there are other parties that are seeking the

7  same information by subpoena.  We're not just talking

8  about Fox.  We're talking about all of the respondents.

9          Let me begin with two threshold observations.

10  The first is that Dish is asking this court to take an

11  extreme position that no discovery whatsoever should be

12  permitted.  And as we know, Rule 45 certainly permits

13  that scenario but it only permits that kind of wholesale

14  foreclosure of discovery upon extraordinary

15  circumstances.

16          The other thing, especially, that's evident in

17  the briefing is that Dish's motion somewhat conflates

18  the concept of undue burden with protection of

19  proprietary information.  They're really two different

20  things.  And while they've talked about burden in their

21  argument, and especially in the pleadings, there really

22  has been no showing of traditional undue burden.

23  There's no suggestion that it's going to be expensive to

24  collect these documents or any documents that would be

25  responsive.  There's no suggestion that there's any

MOTIONS HEARING - MAY 30, 2013

1  electronically stored information that's going to be --

2  that's going to be required to be accessed.  There's no

3  suggestion that there should be any cost sharing.

4        So, I think the focus, really, of the court's

5  attention should not be on the burden issue, but it

6  should be on the protection of intellectual property or

7  trade secrets.

8        Dish essentially argues that documents that

9  are available from other sources are by definition

10 unduly burdensome and should be denied.  They're

11 essentially arguing that documents -- since documents

12 can be available from Aerio third-party discovery is

13 inappropriate.  And that's certainly not the rule in

14 this circuit or any others.

15       We start with the basic -- basically standard

16 for discovery that a request for discovery should be

17 considered relevant if it's possible that the

18 information could be relevant to a claim or defense.

19 And the burden of asserting a -- asserting a restriction

20 on the discovery falls upon Dish.  They bear the burden

21 of objecting and -- and convincing this court that the

22 objection is appropriate.

23       THE COURT:  Do you dispute though,

24 Mr. Gallagher, that the preferred method of discovery of

25 information that might be in the possession of an

MOTIONS HEARING - MAY 30, 2013

1    opposing party, and might be in the possession of a

2    third parties as well is from the opposing party?

3            MR. GALLAGHER:  Oh, absolutely.  And that's

4    exactly what happened in this case, Your Honor.

5    Discovery has been ongoing for sometime against Aerio.

6    But -- but the suggestion that simply some of these

7    documents might be available from Aerio, so none of this

8    discovery is appropriate from Dish is -- is simply not

9    the law.

10           THE COURT:  Who has the burden of showing

11   whether these documents are available from Aerio or not,

12   and if so whether they have been obtained from Aerio?

13           MR. GALLAGHER:  Well, those are two different

14   issues.  I think that -- that the party objecting to

15   discovery has the initial burden of establishing through

16   some sort of appropriate proffer to the court that --

17   that this information is objectionable.  And in simply

18   saying that -- that since some of the discovery requests

19   or some of the subpoenaed requests could be read as

20   requiring us to produce communications with Aerio no --

21   no discovery should occur, they simply haven't carried

22   that burden.

23           Now, with regard to duplication there

24   certainly is a possibility that there could be some

25   duplication in production, and -- but that's -- that is

MOTIONS HEARING - MAY 30, 2013

1    the situation in every third party -- or in many

2    third-party subpoena situations.  The possibility, the

3    mere possibility of duplication isn't enough in order to

4    justify the wholesale foreclosure of discovery.  And in

5    fact, you know, both parties have briefed the relevance

6    of -- of information that while it might be similar,

7    there might be discrete and unique electronically stored

8    information, e-mails, or other documents that Dish has,

9    even if -- even if we're talking about an e-mail thread

10   with Aerio.  There might be BCCs on e-mails that would

11   be relevant.  There might be comments.  There might be

12   marginalia on handwritten notes.  There might be drafts

13   of documents.

14          The point is we -- we don't know what's there.

15   But we do know from other discovery that's occurred in

16   this case that there have been documents obtained from

17   other third parties that -- that are unique to those

18   third parties and the characterizations by those third

19   parties of what it is that Aerio does would be relevant

20   and discoverable, and perhaps admissible in the

21   underlying case.

22          I think the important thing here to point out,

23   between this -- the relationship of these parties, and

24   let's talk about Fox because that's the focus at least

25   of Dish's argument this morning.  Dish is not just some

MOTIONS HEARING - MAY 30, 2013

1    uninterested third party.  Dish is essentially the

2    customer of -- well, certainly the customer of Fox.

3    Dish carries Fox programming.  So Dish is not an

4    uninterested party.  They are a customer.

5              THE COURT:  Right.  But Fox has other

6    customers too, as do some of the other plaintiff's in

7    the underlying litigation.  And have they served

8    third-party subpoenas on other customers besides Dish?

9              MR. GALLAGHER:  Your Honor, I -- I don't know.

10   I don't know.  But --

11             THE COURT:  That troubles me.

12             MR. GALLAGHER:  Well --

13             THE COURT:  That troubles me.  And what

14   troubles me also is the existence of this underlying

15   litigation between Fox and Dish in the Northern District

16   of California.  And, you know, I'm not suggesting that I

17   thoroughly adopt Dish's point of view that this is

18   necessarily a fishing expedition in conjunction with

19   that other litigation, but to the extent that other

20   third-party subpoenas have not been served in connection

21   with the New York litigation on other customers

22   quote/unquote of Fox it does tend to show that there's

23   some targeting going on here, and why that would be

24   occurring is troubling to the court.

25             MR. GALLAGHER:  Well, let me explain why this

MOTIONS HEARING - MAY 30, 2013

```
 1   customer is unique among customers of -- of Fox.  This

 2   customer is both a customer of Fox and a potential

 3   acquirer of Aerio.  And the reason that Dish may have an

 4   interest in acquiring Aerio is because it could effect

 5   Dish's negotiating ability with regard to their

 6   retransmission fees.

 7           THE COURT:  What about Direct TV?  Wouldn't

 8   they have an interest in acquiring Aerio as well?

 9   Aren't there other similar companies to Dish that might

10   have an interest.

11           MR. GALLAGHER:  Well, I believe Direct TV is

12   owned by News Corp., so I mean that's -- you know, and

13   that's probably the only other -- you know, the only

14   other potential competitor in this space.  But -- but

15   Dish is uniquely positioned here.  Because not only are

16   they a customer of Fox, but if Dish acquires Aerio then

17   Dish can essentially obtain the signals of these

18   broadcast television networks from Aerio and use that in

19   lieu of signals that they currently acquire.

20           Now, the reason that's important, it's not

21   because of the fact that they could do that.  It is

22   because that very -- the very thing that makes Aerio an

23   interesting target for Dish is that Aerio permits or

24   arguably permits a -- a -- an acquiring company to avoid

25   paying retransmission fees.  So the reason that this
```

MOTIONS HEARING - MAY 30, 2013

1    discovery is appropriate as to this particular third

2    party is because the very fact that Dish is interested

3    demonstrates that there's market harm.

4          THE COURT:  Well, tell me more about the

5    market harm because, frankly, I find the argument that

6    Dish has made that Judge Nathan has already held that

7    your client has demonstrated that it suffered

8    irreparable harm to be quite compelling.  Why would you

9    need all of this information from Dish to further

10   bolster a finding that's already been made by the

11   district court?

12         MR. GALLAGHER:  Well, there hasn't been --

13   there hasn't been a finding at trial made.

14         THE COURT:  Well, the finding -- the standard

15   for preliminary injunction and permanent injunction with

16   respect to irreparable harm is identical in the Second

17   Circuit, and she's already found, and the Second Circuit

18   has essentially acknowledged that she has already found

19   that there has been irreparable harm to your clients.

20   So that standard is not going to change on a permanent

21   injunction.  That leaves, in my view, the only

22   possibility being that you need this information for

23   proof of your damages claim not your injunction claim.

24         MR. GALLAGHER:  Well, I think the damages

25   claim is absolutely right.  But let me -- I don't want

MOTIONS HEARING - MAY 30, 2013

1   to surrender the hill here on irreparable harm.  I'm not

2   trial counsel in the New York case, but I would be very

3   surprised if this case goes to trial that Aerio would

4   not try to reargue that -- that -- that harm issue.

5           THE COURT:  It's a (unintelligible) the case,

6   Mr. Gallagher.

7           MR. GALLAGHER:  Well, but that doesn't

8   preclude it from being reargued -- I mean, it's --

9   it's -- when you get to trial irreparable harm and

10  damages are interwoven, and it's -- it's clearly

11  relevant to damages.  It's clearly relevant to whether

12  there are damages.  It's clearly relevant to the extent

13  of damages.

14          THE COURT:  Well, tell me how it is relevant.

15          MR. GALLAGHER:  Well, because if Aerio has a

16  particular market value, one of the components of that

17  market value is that Aerio permits either Aerio or the

18  company that owns it to avoid paying retransmission

19  fees.

20          THE COURT:  And it's your contention that the

21  market value of Aerio is somehow relevant to the damages

22  suffered by your clients?

23          MR. GALLAGHER:  Yes, because the market value

24  of Aerio is in many ways tied to the market value of

25  what it does, and the market value of what it does is

```
 1    avoids its owner to repay -- from repaying transmission

 2    fees.

 3              THE COURT:  Well, how is -- how does a breach

 4    of copyright in a copyright infringement claim result in

 5    actual damages that relate to market value of an

 6    infringer?  Show me a case --

 7              MR. GALLAGHER:  Well --

 8              THE COURT:  -- that makes that connection.

 9              MR. GALLAGHER:  Your Honor -- Your Honor, I

10    can't show you a case.  I'm not prepared to cite the

11    court to a case.  If you'd like we would be happy to

12    submit supplemental briefing on that issue.  But the

13    reality is, Dish is -- the very reason that Dish is

14    interested in Aerio is because it has a value.  And that

15    value is absolutely relevant to whether there's a fact

16    of injury for copyright purposes and if so what the

17    damages would be.

18    █████████████████████████████████████████

19    █████████████████████████████████████████

20    ████████████████████████████████████████████

21    ███████████████████████████; that Aerio has taken

22    extensive discovery on this issue of irreparable harm,

23    and that Judge Pittman has ordered all the

24    retransmission negotiations to be produced.  So Aerio

25    certainly has the ability and is certainly positioning
```

MOTIONS HEARING - MAY 30, 2013

1   itself to argue that there is no irreparable harm at

2   trial.

3           So, the -- so the ultimate point, Your Honor,

4   is whether you couch this as irreparable harm or damages

5   or fair use for purposes of the -- of the defense under

6   the Copyright Act, the documents that we are seeking are

7   narrow -- first of all, the request is narrowly

8   tailored.  This is not a fishing expedition.  These are

9   narrowly tailored requests.  The requests are aimed at

10  determining whether Dish had negotiations with Aerio

11  and, if so, what the conclusions that Dish raised -- or

12  reached concerning the value of Aerio and the utility of

13  Aerio.

14          THE COURT:  It's fair to say that the point of

15  the document request is to find out whether Dish is

16  going to buy Aerio and, if so, for how much, right.

17          MR. GALLAGHER:  Right.  And -- and why.  Why

18  is also important.

19          THE COURT:  Okay.

20          MR. GALLAGHER:  Why is extremely important.

21          THE COURT:  We know why, right?  I mean, your

22  client --

23          MR. GALLAGHER:  Well --

24          THE COURT:  -- knows why.  I know why.

25          MR. GALLAGHER:  Yeah.  But that doesn't mean

MOTIONS HEARING - MAY 30, 2013

1   we don't have to prove why at trial.

2            THE COURT:  Do you have to prove why at trial?

3            MR. GALLAGHER:  Well, I think we probably do.

4            THE COURT:  To show copyright infringement and

5   prove damages?

6            MR. GALLAGHER:  Well, I think to prove -- it's

7   all -- it's all included in the concept of what it is

8   that Aerio does and why it causes damage.

9            Finally, Your Honor, the -- the question

10  becomes if the court is inclined to permit discovery

11  under what circumstances should the court permit

12  discovery?  There is a protective order in place.  The

13  protective order has been signed by all of the parties

14  to the litigation.  There is a counsel's-eyes-only

15  provision in the protective order.  It would certainly

16  be appropriate, we believe, for the court to condition

17  production of documents on compliance with that

18  protective order.  It would be appropriate to condition

19  disclosure of the documents to counsel pursuant to the

20  counsel's-eyes-only provision.

21            Now, Dish has suggested that it would be

22  inappropriate for Mr. Stone, in particular Rick Stone at

23  Jenner and Block, to have access to the information

24  because he's counsel both in this case and in litigation

25  against Dish, but -- but that happens all the time.  And

MOTIONS HEARING - MAY 30, 2013

1    if there is some sort of inadvertent use by Mr. Stone of

2    information collected in this case in the other case

3    there would be remedies available to address that in the

4    other case.

5         THE COURT:  Well, let me ask something that's

6    slightly different but that also pertains to the

7    protective order.  What provision, if any, does the

8    protective order make for counsel's use of

9    attorney's-eyes-only information in pleadings that might

10   be reviewed by the client.

11        MR. GALLAGHER:  Your Honor, I --

12        THE COURT:  Is there any provision?

13        MR. GALLAGHER:  I don't know.  Perhaps I could

14   ask Ms. Shepard to address that.

15        MS. SHEPARD:  Your Honor, in the protective

16   order in the Aerio case there is currently a provision

17   that allows some -- I think it's called high level

18   summaries, to be disclosed to in-house counsel.  As I

19   have set forth in my declaration we have agreed to in

20   other circumstances to not allow that.  I certainly

21   think -- that was never raised as a concern by Dish's

22   counsel when they contacted me.  We would be more than

23   amenable to leave it at outside counsel eyes only.  We

24   have no issue, concern.  If there's other notice

25   requirements that they want for future use, not a

MOTIONS HEARING - MAY 30, 2013

1   problem, Your Honor.  It's just important that we get

2   the documents.

3            MR. GALLAGHER:  Your Honor, it would seem to

4   us also that one of the issues that Dish might have is

5   if counsel-eyes-only discovery is permitted what do you

6   do if -- if we mark one of these documents --

7            THE COURT:  Right.

8            MR. GALLAGHER:  -- as a trial exhibit.

9            THE COURT:  Right.

10           MR. GALLAGHER:  And we would -- we would

11  certainly be willing to enter into some sort of

12  agreement or stipulated order with the court that

13  requires notice in that situation and then -- and then

14  Dish could take appropriate action, I would presume, in

15  the Southern District of New York.

16           But we certainly recognize that if -- if we

17  were going to use or one of the parties was going to use

18  one of these documents at trial or in a pleading that

19  was not otherwise sealed that it would be appropriate to

20  give notice and allow them an opportunity to protect

21  that interest.

22           THE COURT:  What is the status of the

23  litigation in the Northern District of California?  It's

24  still on appeal over at the Ninth Circuit; is that

25  right?  The denial of the preliminary injunction?

MOTIONS HEARING - MAY 30, 2013

1          MS. SHEPARD:  The denial of the preliminary

2     injunction is being heard -- there's two preliminary

3     injunction motions that have been filed, Your Honor.

4     The denial of the preliminary injunction motion is being

5     heard next week for the first preliminary injunction

6     ruling.  The other ruling, I believe, is still under

7     submission in that -- in that case.

8          THE COURT:  In the district court.

9          MS. SHEPARD:  In the district court, yes.

10    It's been heard and is under submission with the trial

11    court there.

12         THE COURT:  All right.  Thank you.  I'll give

13    you an opportunity to respond Ms. Echtman.

14         MS. ECHTMAN:  Thank you.

15         MR. GALLAGHER:  Well, Your Honor, that's

16    basically the substance of my argument.  If there are no

17    further questions I thank the court.

18         THE COURT:  Well, you know, I am going to

19    invite you, Mr. Gallagher -- and of course counsel for

20    Dish may do the same -- to attempt to clarify for me the

21    connection between the information that you sought --

22    you seek, and damages.  Because, frankly, I'm not buying

23    the argument with respect to irreparable harm.  I think

24    that the judge has already made a finding of irreparable

25    harm with respect to the preliminary injunction.  I find

MOTIONS HEARING - MAY 30, 2013

1   no meaningful difference in the case law whatsoever

2   between the quality or standard for irreparable harm and

3   a preliminary injunction and on a permanent injunction.

4   I think that is the law of the case.

5          The parties may want to argue it out the

6   ying-yang, but if I were Judge Nathan I would limit

7   argument because the law of the case is that irreparable

8   harm has already occurred; therefore, from my

9   perspective the information that you seek from Dish is

10   not necessary and probably not relevant to a showing of

11   irreparable harm at this stage.

12          But I am interested in the connection between

13   the information you seek and your claim for damages

14   under the Copyright Act.  And that is not clear to me.

15   I understand in general your argument about market

16   value, but, you know, most copyright cases result in a

17   finding of statutory damages.  There isn't a lot of law

18   on actual damages on the copyright cases, and I haven't

19   found any yet that relates to actual damages in market

20   value.

21          So, to the extent that you can clarify that

22   connection at length between the information that you

23   seek and proof of actual damages in the copyright claim,

24   I'll invite to you brief that.  I'd like you to do that

25   in no more than five pages, please.  And I'd like you to

MOTIONS HEARING - MAY 30, 2013

Page 24

1   do that within one week of today's date unless there's a

2   reason why you need more time.

3          MS. SHEPARD:  May I?

4          THE COURT:  You may.

5          MS. SHEPARD:  If I can just address that one

6   issue, Your Honor.

7          THE COURT:  You may.

8          MS. SHEPARD:  We'll be happy to submit

9   additional briefing.  With respect to the issue of the

10  framing of that argument, Your Honor, we -- I would ask

11  that that be with respect to the irreparable harm and

12  market harm.  And I want to clarify we are not seeking

13  actual damages.

14         THE COURT:  (Unintelligible).

15         MS. SHEPARD:  So that I don't want Dish to be

16  in a position that it has to argue something -- and I

17  have looked at the cases that you are talking about,

18  Your Honor, with respect to that issue, so --

19         THE COURT:  All right.

20         MS. SHEPARD:  -- the other thing, with respect

21  to the timing, I would typically say a week would be

22  great, Your Honor, but we have an opposition to a

23  summary judgment motion due in the Aerio case as well as

24  numerous depositions and a hearing this next week on

25  Tuesday.  So, if we could have at least to maybe the

MOTIONS HEARING - MAY 30, 2013

Page 25

 1   following Tuesday to submit those papers I would

 2   appreciate it.

 3            THE COURT:  That's fine.  Let me ask you --

 4            (Phone ringing.)

 5            THE COURT:  Sometimes that happens.  It

 6   doesn't mean anything.  Don't worry about it.  It will

 7   go off.  Somebody obviously is desperately in need of

 8   talking to me.

 9            RECORDED MESSAGE:  Hello.  This is a message

10   from (unintelligible) Credit Union call services

11   security department.  For your protection --

12            THE COURT:  I have no idea what this is.

13            RECORDED MESSAGE:  -- we have placed

14   restrictions on your ATM card.

15            THE COURT:  It's a robo call from some --

16            RECORDED MESSAGE:  To remove restrictions and

17   reactivate your card we must run a brief verification

18   process to show that you are in possession of your card.

19   This is just a security measure.  If we already have

20   your information security, skip --

21            THE COURT:  Thank you.

22            Isn't it amazing that the companies who -- who

23   do credit card checks or own credit cards robo dial

24   federal court numbers while court is in session.  I have

25   to admit, that's a first.

MOTIONS HEARING - MAY 30, 2013

1          Anyway, let me ask you about your comment

2     about the fact that the plaintiffs in the underlying

3     case are not seeking actual damages.  Has the complaint

4     been amended, because the original complaint does make a

5     request and a prayer for relief for damages proven, or

6     statutory damages.

7          MS. SHEPARD:  It hasn't formally been amended,

8     Your Honor, but through the correspondence with the

9     court and all of the arguments that appeared before

10    Magistrate Judge Pittman he has -- in his rulings that

11    he's issued, it's clear that we have affirmatively taken

12    that position and are bound by that determination.

13         THE COURT:  All right.  So in other words,

14    your position is that to the extent that additional

15    briefing is requested it should relate to the issue of

16    irreparable harm and also statutory damages?

17         MS. SHEPARD:  Really market harm, Your Honor.

18         THE COURT:  Market harm.

19         MS. SHEPARD:  Market harm and irreparable harm

20    because the --

21         THE COURT:  Okay.

22         MS. SHEPARD:  -- rulings that Judge Pittman

23    has made in the discovery that's been taken have really

24    been focusing on those issues and we can relate those

25    matters to you that way.

MOTIONS HEARING - MAY 30, 2013

1          THE COURT:  All right.  Fair enough.  I'll

2   give you an additional brief of five pages due on or

3   before -- I think you were requesting -- let's see, that

4   would be Tuesday, June 10th?

5          MS. SHEPARD:  Yes, Your Honor.

6          THE COURT:  Will that work?

7          MS. SHEPARD:  Yes.

8          THE COURT:  Wait a minute.  Let me make sure

9   I'm looking at the right year.  Tuesday, June 11th.

10          MS. SHEPARD:  June 11th, yes, Your Honor.

11          THE COURT:  All right.  That's fine with me.

12   And of course Dish is welcome to submit simultaneous

13   briefing at the same time.  And is there any reply,

14   Ms. Echtman, from Dish?

15          MS. ECHTMAN:  Yes, there is, Your Honor.

16          MR. GALLAGHER:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MS. SHEPARD:  Thank you.

19          MS. ECHTMAN:  Your Honor, instead of

20   simultaneous briefing may I request an opportunity to

21   respond, because I don't know what arguments are going

22   to be made.

23          THE COURT:  That's fine.  And this really is

24   just to -- this is in the nature of what I would request

25   from my law clerks with respect to a memorandum of

MOTIONS HEARING - MAY 30, 2013

Page 28

1   existing law on the connection between damages, proof of

2   market harm, so to speak, and irreparable harm, in the

3   context of a copyright infringement action either at the

4   preliminary injunction or permanent injunction stage.  I

5   don't care much about the difference there.  But to the

6   extent that you feel that you need some time to respond

7   I'll allow that.  Is a week sufficient time to respond?

8             MS. ECHTMAN:  One week is sufficient.

9             THE COURT:  All right.  So the order in the

10  minutes should reflect that the -- the respondent shall

11  file a brief with respect to the actual harm, slash --

12  or excuse me, damages, slash, irreparable harm issue on

13  or before June 10th of 2000 -- June 11th.

14            MS. SHEPARD:  June 11th.

15            MR. GALLAGHER:  June 11th.

16            THE COURT:  -- excuse me -- June 11th of 2013,

17  and the movant shall respond on or before June 18th of

18  2013.  No reply will be permitted.

19            Ms. Echtman, do you have any further reply?

20            MS. ECHTMAN:  I do.  One point that was made

21  by counsel for respondents is that I mentioned Fox.  And

22  I -- I did mention Fox in my argument because Fox is the

23  entity that Dish is in litigation with in the Central

24  District of California.  And as Ms. Shepard mentioned

25  we've got one preliminary injunction motion that was

MOTIONS HEARING - MAY 30, 2013

1   denied, and the appeal is being argued on Tuesday in

2   Pasadena, and there's another preliminary injunction

3   motion by Fox that's under submission before Judge Gee.

4          THE COURT:  All right.

5          MS. ECHTMAN:  But also that's because, like

6   you, Dish is troubled by the fact that it was singled

7   out here.  There are other very large pay television

8   providers in the United States.  You mentioned Direct

9   TV.  There's also AT&T and there's Time Warner.  AT&T,

10  Direct TV and Time Warner are other entities that were

11  mentioned in the Wall Street Journal as potentially

12  having discussions with Aerio.  To our knowledge those

13  entities, which also provide Fox's network and other

14  networks to large numbers of individuals around the

15  country on a pay TV basis and pay rate transmission

16  consent fees to Fox and others, were not subpoenaed to

17  our knowledge.  And their internal confidential

18  negotiations strategy was not requested.

19          In addition, there was a suggestion that we

20  had conflated the burden issue with disclosure of

21  confidential information.  Well, the disclosure of

22  confidential information is burdensome.

23          THE COURT:  I understand.

24          MS. ECHTMAN:  And that's not to mean that

25  there wouldn't be burden to Dish to prepare a witness

1    for a 30(b)(6) deposition, which requires that you

2    produce someone most knowledgeable and all of the

3    relevant documents that might be out there.  Of course,

4    we would have to do an ESI search which is expensive and

5    invasive and time consuming.  In fact, the respondents'

6    counsel said they're looking for e-mail trails.  Well,

7    that's not going to be in hard copy.  That's going to be

8    an e-mail.  And any response to a subpoena is burdensome

9    and a hardship on a non party and it shouldn't be

10   required when it's duplicative.

11          In addition, respondents' counsel said

12   duplication is not a basis to deny it.  It doesn't

13   matter that you may have requested something first from

14   a party to the litigation.  In fact, there are multiple

15   cases from this district that say just that.  To the

16   extent that discovery is available from the party, you

17   don't get anything from the non party.  That's in the

18   EchoStar case.  EchoStar v. News Corp., and it's also in

19   Your Honor's decision in the Rembrandt case where

20   repeatedly with respect to particular requests where the

21   discovery was available from the party, it was denied

22   from the non party.

23          THE COURT:  What about this, Ms. Echtman.

24   What if I required as a condition of respondents'

25   subpoena that the plaintiffs in the underlying

MOTIONS HEARING - MAY 30, 2013

1    litigation create a list of documents relating to these

2    topics that they have already received from Aerio, and

3    disclose those back to you so that no duplication of

4    those documents would occur?

5              MS. ECHTMAN:   Yeah.   And Dish would then have

6    to go through and do an ESI search.   The subpoena was

7    not only directed to Dish.   There was another subpoena

8    that was sent to a related entity, EchoStar

9    Technologies, which is Dish's technology vendor, and

10   also the subpoena asked for all documents from any

11   related entities.   It's a very broad subpoena.   It's

12   Dish Network, LLC and it attempts to get documents from

13   every related entity that might have anything about

14   Aerio or any types of valuations of Aerio.

15             So, it still would entail a burden of

16   non-party discovery when they don't have any basis to

17   think or suspect that Aerio's production was not

18   complete.   They can ask Aerio at deposition if it had

19   any -- if they had any documents that they destroyed,

20   but without a reason to believe that the production is

21   incomplete, there's no reason to burden Dish with

22   testing a party's production of its documents.   It's

23   just not Dish's responsibility.

24             THE COURT:   In Dish's view is there any

25   meaningful difference between the burden associated with

MOTIONS HEARING - MAY 30, 2013

1   producing the documents and the burden associated with

2   giving a deposition?

3          MS. ECHTMAN:  There's no distinction when

4   you're talking about a 30(b)(6) deposition, because a

5   30(b)(6) deposition requires you to assemble documents

6   and prepare a witness.  It's not just saying, well, this

7   is a person who was mentioned who was on an e-mail chain

8   with someone, and I want to ask them questions about

9   that discrete e-mail chain where the person would have

10  it readily available.  What we've got is a 30(b)(6)

11  deposition.  And, in fact, the Microsystems case out of

12  the Federal Circuit says just that.  When you're talking

13  about a 30(b)(6) deposition you can't divorce it from a

14  document request.  There's the same level of burden.

15         THE COURT:  All right.  Anything else?

16         MS. ECHTMAN:  I mean, the other issues really

17  go to irreparable harm and the market harm issue, which

18  there's going to be supplemental briefing on.  I'll just

19  mention briefly if -- Fox knows what it gets in

20  retransmission consent fees --

21         THE COURT:  Right.

22         MS. ECHTMAN:  -- related to its broadcast

23  network.  If it's concerned that a party is going to --

24  if some entity is going to stop paying at those fees, it

25  knows what they are.  It knows --

MOTIONS HEARING - MAY 30, 2013

1          THE COURT:  Right.

2          MS. ECHTMAN:  -- how to project them into the

3   future.  There's nothing that is specific to Dish that

4   can help them do that analysis.

5          THE COURT:  I don't understand why that would

6   not be the measure of damages, the loss of the

7   retransmission fees that would occur as a result of the

8   purchase of Aerio by Dish or somebody else.

9          MS. ECHTMAN:  Which are well known to Fox.

10   They don't --

11          THE COURT:  Well known?

12          MS. ECHTMAN:  And all the others.  They don't

13   have to come to Dish and say what are you paying us, and

14   what -- and if you happen to adopt the Aerio system what

15   would you stop paying us.

16          THE COURT:  Right.

17          MS. ECHTMAN:  So -- so why -- so why do we go

18   here?  That's our basic issue with what's being

19   requested is that there just doesn't seem to be a need

20   and given -- at all, and there needs to be a substantial

21   need to get Dish's internal documents.  And in light of

22   the fact that there is ongoing litigation between Dish

23   and Fox, and the 30(b)(6) notice references products

24   that are issue in that litigation, it makes it all

25   suspect that Dish has been singled out here for

MOTIONS HEARING - MAY 30, 2013

Page 34

1    discovery that no other similarly situated paid TV

2    provider has been asked for.

3              THE COURT:  All right.

4              MS. ECHTMAN:  Thank you, very much, Your

5    Honor.

6              THE COURT:  Thank you.

7              MR. GALLAGHER:  Your Honor, could we just make

8    one quick, I guess, sur-rebuttal point?

9              THE COURT:  You may.

10             MR. GALLAGHER:  And would it be permissible

11   for Ms. Shepard to make that?

12             THE COURT:  Yes, that's fine.

13             MR. GALLAGHER:  All right.

14             MS. SHEPARD:  Thank you, Your Honor.  ████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████

19             THE COURT:  ██████████████████████████

20   ██████████

21             MS. SHEPARD:  ████████████████████████

22   ████████████████

23             THE COURT:  Okay.

24             MS. SHEPARD:  ██████████████████████

25   ████████████████████████████████████████  if I may

MOTIONS HEARING - MAY 30, 2013

Page 35

1    tell you, with respect to retransmission consent if

2    you're a commercial provider you can get -- you can get

3    our broadcast signals at your home via antenna without

4    paying.  If you're a commercial service provider and you

5    capture the signals and you retransmit them you have to

6    pay.  That's what Dish does.

7            THE COURT:  Right.

8            MS. SHEPARD:  And they pay us those

9    retransmission consent fees.

10           THE COURT:  Right.

11           MS. SHEPARD:  ███████████████████████

12   ████████████████████████████████████████████████

13   ███████████████████████████████████████████████

14   ██████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████

17   ███████████████████████████████████████████

18       ████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ███████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████

4          There's been test -- there's public testimony

5   and statements by Charlie Ergen that the existence of

6   Aerio is having downward pressure on the retransmission

7   consent fees.  Quantifying that is really not possible,

8   and that's the definition of irreparable harm for us.

9   So that's why I want to focus the briefs on irreparable

10  harm.

11 ██████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ██████████████████████████████████████████

15 ██████████████████████████████████████████

16 ███████████████████████████████████████████

17 ██████████████████████████████████████████

18 ██████████████████████████████████████████

19 ███████████████████████████████████████████

20 ██████████████████████████████████

21 █████████████████████████████████

22 ███████████████████████████████████████████

23 ██████████████████████████████████████████

24 ███████████████████████████████████

25 ██████████████████████████████████████████

MOTIONS HEARING - MAY 30, 2013

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████

3  ██████

4       It's -- we need the discovery from Dish.  It's

5  not duplicative.  It's -- it is important.  We will do

6  the briefing on irreparable harm and market harm to

7  explain these issues and why it's not.  While I would

8  love it if it was the law of the case and we didn't have

9  to prove irreparable harm, the way the record exists

10  right now it's not the case.  And we are not targeting

11  Dish.  ████████████████████████████████████

12  ███████████████████████████████

13  ██████████████████████████████████████████████

14  ████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ██

18       And we will engage in whatever protective

19  order measures that need to be put in place to address

20  Dish's concerns on the confidentiality and notice.  I've

21  always been willing to do that.  If we truly had had a

22  meet-and-confer with respect to that as opposed to just

23  an absolute we-won't-give-you-anything, those issues

24  could have been addressed in a dialogue with Dish's

25  counsel as the burden issues could have been.  But it's

1   been absolute no production, no discussion as opposed to

2   talking.

3           THE COURT:  Let me, Ms. Shepard, and

4   Ms. Echtman, for your benefit too, let me ask you or

5   focus you on one issue that continues to trouble me with

6   respect to this market harm issue in general.  And that

7   is that I -- I don't understand how production of

8   documents relating to any potential negotiations between

9   Aerio and Dish would necessarily demonstrate the amount

10  of downward pressure that could be placed on

11  retransmission fees from a potential agreement between

12  these two entities.  I understand that showing that

13  they're in communications and that showing that Dish

14  wants to buy Aerio and wants to avoid paying your

15  clients for retransmission fees would show --

16          MS. SHEPARD:  Uh-huh.

17          THE COURT:  -- that there could be some harm

18  there.  But production of these specific documents, to

19  me it's a leap of faith to assume that that specific

20  information about whatever minutiae of their

21  negotiations there might be would actually result in a

22  quantifiable amount of downward pressure.  What you're

23  really talking about is getting information relating to

24  negotiating strategies and negotiating positions, and

25  how that will translate to a quantifiable amount of

MOTIONS HEARING - MAY 30, 2013

Page 39

1    downward pressure I don't understand.

2          MS. SHEPARD:  Well --

3          THE COURT:  It seems to me you'd do better to

4    take Charlie Ergen's deposition -- and I understand

5    that's another part of -- that's a part of the subpoena

6    at issue here, a separate subpoena -- and say to him

7    what kind of downward pressure do you think it's going

8    to have -- you know, effect in the industry as a result

9    of the possibility for these kinds of connections,

10   because he's an experienced person who enters into

11   negotiations all the time on behalf of his company.  But

12   in terms of document production and the details of these

13   negotiations, I see that as a leap of faith.

14         MS. SHEPARD:  With respect to the agreements,

15   the first -- I think it's the first five requests, Your

16   Honor, that deal with the -- whatever agreement is

17   contemplated.  There's probably only one or two of those

18   as opposed to all four or five of them, but just to make

19   sure we didn't miss one.  I believe that the way they

20   are framed is the drafts and the memorandum.  We are not

21   seeking all of the e-mail communications back and forth,

22   and was particularly targeted that way to eliminate and

23   streamline the process so we could take the deposition

24   in April when we were trying to take it and get the

25   documents.

MOTIONS HEARING - MAY 30, 2013

1              There are other document requests dealing with

2    the communications on the impact on retransmission fees,

3    but those --

4              THE COURT:  (Unintelligible) documents.

5              MS. SHEPARD:  -- those would truly bear on

6    that issue, and it's not the minutiae of the

7    negotiations as you were pointing out, that it would

8    really be that plan.  And so I do think that those

9    documents would -- those requested documents would

10   reveal that -- that issue.  So --

11             THE COURT:  All right.  That --

12             MS. SHEPARD:  -- I hope that helps.

13             THE COURT:  That's a general answer to my

14   question.  I know you will have an opportunity to brief

15   that further if you wish.

16             MS. SHEPARD:  Right.

17             THE COURT:  Do you want to respond to that,

18   Ms. Echtman?

19             MS. ECHTMAN:  A few things I'd like to respond

20   on.  First of all, there has been no subpoena issued

21   directly to Mr. Ergen.  There is a 30(b)(6) --

22             THE COURT:  Yes.

23             MS. ECHTMAN:  -- deposition, that would be an

24   Apex deposition which --

25             THE COURT:  I understand.

MOTIONS HEARING - MAY 30, 2013

Page 41

1          MS. ECHTMAN:  Which has --

2          THE COURT:  I understand.

3          MS. ECHTMAN:  -- not been requested, and that

4    we would object to.

5          THE COURT:  I was just simply throwing that

6    out for the purpose of arguing with these brilliant

7    lawyers I have in my courtroom this morning.

8          MS. ECHTMAN:  And I'd also like to point out

9    that the 30(b)(6) notice is much broader than the

10   document requests.  Although we think the document

11   requests are too broad, the 30(b)(6) topics include

12   communications with Aerio broadly, negotiations with

13   Aerio.  And so they -- it goes really well beyond

14   anything that's targeted.  It's very broad and it would

15   require Dish to prepare someone on all communications

16   with Aerio of any nature and all negotiations with Aerio

17   of any nature.  I don't have a transcript of the

18   deposition that was taken of an Aerio representative.  I

19   would think an Aerio representative would know full well

20   what conversations they had with Dish and what they

21   relate to.

22

23

24

25

MOTIONS HEARING - MAY 30, 2013

Page 42

1

2

3

4

5

6

7

8

9        So I just wanted to -- to clarify those --

10   those few points.

11        THE COURT:  All right.  Thank you very much,

12   counsel.  As you probably have guessed by this point I'm

13   going to take this under advisement, welcome your

14   briefing, and I will try to issue a written order in due

15   course upon receipt of the additional briefing.  And

16   we'll be in recess.  Thank you.

17        MS. ECHTMAN:  Thank you, Your Honor.

18        MS. SHEPARD:  Thank you.

19        MR. GALLAGHER:  (Unintelligible).

20        THE COURTROOM DEPUTY:  All rise.  Court is in

21   recess.
                (Whereupon, the within hearing was then in
22   conclusion at 10:47 a.m. on this date.)
                I certify that the foregoing is a correct
23   transcript, to the best of my knowledge and belief
     (pursuant to the quality of the recording) from the
24   record of proceedings in the above-entitled matter.

25